**Adrian T. HALL, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 81–40.**

District of Columbia Court of Appeals.

Argued July 9, 1982.

Decided Dec. 15, 1982.

Bruce B. McHale, Washington, D.C., appointed by the court, for appellant.

Richard A. Stanley, Asst. U.S. Atty., Washington, D.C., with whom Charles F.C. Ruff, U.S. Atty., Washington, D.C., at the time the brief was filed, John A. Terry, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, and John R. Fisher, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, FERREN, Associate Judge, and GALLAGHER, Associate Judge, Retired.

GALLAGHER, Associate Judge, Retired:

A jury convicted appellant of first-degree murder while armed[1] and carrying a pistol without a license.[2] The trial court imposed consecutive sentences of twenty years to life on the first count and one to three years on the second count. Appellant contends (1) there was insufficient evidence of premeditation and deliberation to support his first-degree murder conviction, and (2) the trial court erred in limiting appellant's introduction of evidence linking another person to the murder. We affirm.

On July 13, 1979, the partially decomposed body of Jane Marbley, the decedent, was found in an unused room on the second floor of building 160 at the Washington Navy Yard, where she had been employed as a custodial worker. The body was naked except for a tank top pulled down around her waist exposing her breasts. She lay on her back on a thin pad with one or more cushions under her shoulders. At the time of her death, decedent was wearing a considerable amount of jewelry. Next to the body was a pair of woman's sandals, a pair of denim pants, a pair of black panties and a pocketbook containing six dollars. Also found on the floor around the body were six shell casings. One live round was recovered from beneath the decedent's right heel. Other than some trash, a bench, a chair, and the above items, the room was empty.

Dr. Brian Blackbourne, a forensic pathologist and Deputy Chief Medical Examiner for the District of Columbia, testified that decedent's death resulted from multiple gunshot wounds to the chest and abdomen. There were four wounds on the right side of her chest, two wounds on her abdomen, and two wounds through her right forearm. The doctor recovered six bullets from the body and testified that the position of the

1. D.C.Code 1981, §§ 22–2401, –3202.

2. D.C.Code 1981, § 22–3204.

wounds indicated the gunman stood above and fired down towards the decedent. There was no evidence that a struggle had preceded the killing. Decedent's clothes were neatly ordered and her purse was intact. Her clothes were not bloodstained, and there were no other injuries, bruises or scrapes on her body. The doctor estimated that decedent had been dead anywhere from three to seven days at the time the body was discovered.

While investigating an unrelated bank robbery some two months later, the police recovered a semi-automatic pistol from the apartment of Pamela Ginyard. Ballistics evidence introduced by Detective Voorhees, an expert firearms examiner, showed that this pistol had fired the shots that killed decedent. Ms. Ginyard testified that the weapon had been placed in her apartment by Gregory Hall, appellant's brother.

Detective Voorhees also testified that he had conducted tests with the pistol by loading it to capacity with seven rounds and then attempting to fire all seven shots in succession. He repeated the test four times and on each occasion the gun jammed as he attempted to fire the sixth round. On two occasions, he was able to fire the sixth round after drawing the slide to the rear and manually guiding the last round from the magazine into the gun's barrel. He was then able to fire the seventh round from the magazine, but only if he allowed the slide to go forward slowly. If the slide were allowed to go forward on its own, the seventh round would also jam. On two other occasions, drawing the slide did not clear the weapon. Voorhees had to remove the magazine, shake the weapon to dislodge the jammed round, and then reinsert the magazine into the firearm. Voorhees testified that markings appearing on the live round found beneath decedent's heel indicated it came from a pistol with a mechanism that had jammed during firing.

A Navy Yard custodial supervisor testified that appellant had worked on the same crew with the decedent until June 29, 1979, when appellant's employment was terminated. At trial the government introduced into evidence portions of a written statement given by appellant to a police detective named Brooks about five weeks after decedent's body was found. Appellant told Detective Brooks that he and the decedent had been "lovers" for the preceding four years. When asked if he and the decedent had used building 160 at the Navy Yard for sexual liaisons, and if so what room, appellant told the detective, "[Y]es, we did. It was in the room where Jane [Marbley] was found." Appellant told Detective Brooks that his relationship with the decedent ended during the winter of 1978–79.

Sheila Britten, a close friend of the decedent, testified that decedent and appellant had an "intimate" relationship. During the latter part of 1978, Britten accompanied them to a club. Britten testified that during the evening, decedent and appellant were "just like bread and butter ... when she got up to move, he [was] right behind her and vice-versa ... it was just like I wasn't there."

In the spring of 1979 some four months before her death, decedent became involved romantically with another co-worker at the Navy Yard named Joseph Williams. Britten testified that she saw Williams and decedent together on a number of occasions. One day after work in early June, decedent and Williams met at Britten's house. The three of them talked together for a while; thereafter, Britten left decedent and Williams alone in the kitchen. When she returned she saw Williams kissing decedent.

Williams testified that he met the decedent in the fall of 1978. Williams twice had sexual intercourse with decedent. He spoke with her on the telephone three or four times a week for the four months preceding and up until her death. On the Friday before the Monday decedent was reported missing, decedent, Williams, and another friend spent the evening at Williams' house; they sat and talked, and had a few drinks together. Williams stated that he was "very fond" of decedent, and had a "warm relationship" with her.

During the trial, appellant twice moved for judgment of acquittal contending that

the evidence established only the offense of second-degree murder. The court denied these motions ruling that the government had introduced sufficient evidence of deliberation and premeditation to support the first-degree murder count. Appellant also asked the court to permit him to introduce evidence showing that prior to her death decedent was involved in a "special relationship" with another employee at the Navy Yard. The court refused appellant's request ruling that appellant had been unable to establish a sufficient connection between the other employee and the crime to make the evidence relevant. Appellant challenges these rulings here.

## I

Appellant does not challenge the sufficiency of the evidence necessary to convict him of criminal homicide. Rather, he more narrowly attacks as deficient the evidence of first-degree, as opposed to second-degree murder. This court will review claims of insufficient evidence in a light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact. *Byrd v. United States,* D.C.App., 388 A.2d 1225, 1229 (1978); *Johnson v. United States,* D.C.App., 293 A.2d 269, 271 (1972). In applying this standard, the reviewing court does not legally differentiate between circumstantial and direct evidence. *Frendak v. United States,* D.C. App., 408 A.2d 364, 371 (1979); *Byrd v. United States, supra.*

■ Premeditation and deliberation distinguish first and second-degree murder. "[F]irst-degree murder, with its requirement of premeditation and deliberation, covers calculated and planned killings, while homicides that are unplanned or impulsive, even though they are intentional and with malice aforethought, are murder in the second degree." *Harris v. United States,* D.C.App., 375 A.2d 505, 507 (1977), *quoting Austin v. United States,* 127 U.S. App.D.C. 180, 188, 382 F.2d 129, 137 (1967). We have explained the key concepts of premeditation and deliberation as follows:

To prove premeditation, the government must show that a defendant gave "thought before acting to the idea of taking a human life and (reached) a definite decision to kill." Deliberation is proved by demonstrating that the accused acted with "consideration and reflection upon the preconceived design to kill; turning it over in the mind, giving it second thought." Although no specific amount of time is necessary to demonstrate premeditation and deliberation, the evidence must demonstrate that the accused did not kill compulsively, in the heat of passion, or in an orgy of frenzied activity. [*Frendak v. United States, supra* (citations omitted).]

Premeditation and deliberation may be inferred from sufficiently probative facts and circumstances. *Harris v. United States, supra,* 375 A.2d at 508.

■ Three legally significant reasons emerge from these facts and circumstances to sustain the trial court's finding of sufficient evidence to submit the issue of premeditation and deliberation to the jury.

■ First, the government introduced evidence of motive. The presence of a motive suggests a purposeful or reasoned killing. *See United States v. Sutton,* 138 U.S.App. D.C. 208, 219, 426 F.2d 1202, 1213 (1969). *Cf. Austin v. United States, supra,* 127 U.S. App.D.C. at 190, 382 F.2d at 139. For four years, decedent and appellant shared an intimate, sexual and romantic relationship. In the winter before her death, they were "just like bread and butter." A short time after, this relationship ended and decedent became involved with another man, Joseph Williams. Decedent and Williams twice had sexual intercourse, and decedent's friend discovered them kissing in her kitchen. Williams and decedent spoke on the telephone three or four times a week; their relationship was "warm"; he was "fond" of her. On the Friday before she was reported missing, they spent the evening together. This evidence permits an inference that appellant was a lover who, having been replaced by another man, had a motive to kill. *See United States v. Sutton, supra.*

Second, the government introduced evidence from which the jury could have found that appellant brought the murder weapon to the scene of the crime. This permits the inference that appellant "arrived on the scene already possessed of a calmly planned and calculated intent to kill." *Belton v. United States,* 127 U.S.App. D.C. 201, 203, 382 F.2d 150, 153 (1967). *See United States v. Brooks,* 146 U.S.App.D.C. 1, 8–9, 449 F.2d 1077, 1084–85 (1971) (evidence that accused brought shotgun and knife to scene of crime sufficient to permit jury to infer premeditated killing); *United States v. Sutton, supra* (evidence that rejected suitor carried murder weapon to scene of killing sufficient to permit jury to infer premeditation); *Frendak v. United States, supra* (evidence that defendant brought gun to murder scene "highly probative" of premeditation and deliberation). The room where decedent's body was found was only sparsely furnished; there was no cabinet or bureau with drawers where the weapon could have been kept. Thus, it is unlikely that the killer found the pistol after arriving at the scene of the murder. Furthermore, none of the evidence indicates that decedent arrived with the gun. Her clothing and pocketbook were lying next to her body and had not been disrupted, suggesting that she had not hidden the pistol among them. Nor was there any evidence of struggle over the gun. The room was ordered and there were no marks on decedent's body other than six gunshot wounds. Although the government was unable to show directly that appellant brought the gun to the scene of the murder, the circumstances here sufficiently permit this inference.

Finally, the manner and circumstances of decedent's death point to a "planned and calculated intent to kill." *Belton v. United States, supra.* Decedent lay on her back, almost naked, wearing jewelry, her clothes and belongings orderly arranged. In this vulnerable position, decedent was killed by a gunman who stood above her and fired eight shots at point-blank range down towards and into her torso. Between the sixth and seventh rounds, according to the

government's ballistic expert, the gun jammed. To fire the last shot, appellant was forced either to (1) guide the last round from the magazine into the gun's barrel manually, or (2) remove the magazine, shake the weapon to dislodge the jammed round, and then reinsert the magazine into the firearm. A live round found beneath decedent's heel had markings indicating that it came from a pistol with a jammed mechanism. Hence, after the sixth shot appellant most likely had to remove magazine, dislodge this live round, and put the magazine back into the firearm—all to fire the final bullet. Although not dispositive, the necessary interruption and subsequent continuation of appellant's criminal act while decedent lay in this vulnerable position is sufficiently probative to support an inference of premeditation. *Cf. United States v. Sutton, supra* (first-degree murder conviction upheld where evidence fails to "conjure up images" of killing committed during an impulsive and senseless frenzy).

The evidence in this case is entirely, yet quite properly, circumstantial. *See Byrd v. United States, supra* (appellate court makes no legal distinction between circumstantial and direct evidence in reviewing sufficiency). When the evidence here is viewed in a light most favorable to the government, we cannot say that the jury "could only speculate and surmise, without any basis in the testimony or evidence, that appellant acted with premeditation and deliberation." *Austin v. United States, supra.* Under the particular circumstances here, including evidence that appellant was a former lover with a motive to kill, carried the murder weapon to the scene of the crime, and fired eight shots into decedent's torso while stopping once to assist manually the firing of the final bullet, the trial court properly submitted the issue of first-degree murder to the jury.

## II

Appellant secondly contends that the trial court erroneously excluded evidence tending to show that prior to her death decedent was involved in a relation-

ship with another Naval Yard employee, thereby creating the inference of another rejected suitor with a similar motive to kill. In *Brown v. United States,* D.C.App., 409 A.2d 1093, 1097 (1979), we set forth the standard for evaluating the admissibility of evidence tending to show that another person has committed the crime for which the accused has been charged:

> [B]efore evidence of the guilt of another can be deemed relevant and thereby admissible, the evidence must clearly link that other person to the commission of the crime. Even when such evidence is relevant, the trial court must weigh its probative value against its prejudicial impact, including its propensity to mislead the jury or confuse them, to determine whether to admit the evidence. [Citations omitted].

Appellant attempted to establish that decedent and her supervisor, Arlis Hampton, maintained a "special friendly relationship." Defense counsel initially proffered evidence of Hampton's employment history. The government objected, but the court deferred its ruling, stating:

> I don't know how you are going to get this before a jury. Seems to me if you can show he had a relationship with Ms. —the decedent, and he had some motive, then that might be different. Then maybe you could tie this in. Until that's done, [it] doesn't seem that this has relevance.

Naval Yard worker Richard Tillman then testified that he saw decedent and Hampton some four months before her death, engaging in quiet conversation either while walking alone together or in Hampton's office. He saw them talking in the halls "about five times" and talking in Hampton's office "about three times" during working hours. They attended one work-related function, a film, and sat by themselves talking. Tillman, however, had never seen the decedent and Hampton kiss or

hold hands. When asked, "In fact, all they did was talk together, isn't that correct?" he replied, "That's correct." Tillman testified further that two months before decedent's body was found, decedent and Hampton were not seen together as often. One month later, Hampton was transferred from the Navy Yard. After his transfer, Tillman continued to see him at the Navy Yard, including the Monday and Wednesday prior to discovery of the body.

The government moved to strike Tillman's testimony on the ground that it did not establish a relationship between decedent and Hampton. Defense counsel proffered Tilman's further testimony that Hampton often brought pistols to the Navy Yard grounds. Tillman, however, would not be able to identify any of the pistols as a .25 caliber automatic, the type of weapon that killed decedent. The court denied the motion to strike, subject to reconsideration. Defense counsel agreed to defer Tillman's additional testimony pending introduction of further evidence of Hampton's relationship with decedent.

Another employee at the Navy Yard, Maureen Brown, testified that after Hampton's transfer she saw him at least once a week at the Navy Yard, but not after the body was found. The government moved to strike this testimony. The court agreed, stating, "That's pure speculation until we know whether he had reason to come around before and didn't have reason afterwards. You need more than just that." The court told the jury to disregard the testimony, and also told defense counsel, "I think you realize how serious it is that you tie this together, at least sufficiently that there's a basis for the Court submitting it to the jury."[3]

Appellant introduced no further evidence of Hampton's relationship with decedent. Although the trial court did not strike Tillman's testimony, it limited defense counsel's closing argument to evidence that for-

---

**3.** Defense counsel also proffered testimony that in response to a question concerning decedent's whereabouts, Hampton said, "[S]he's probably somewhere with her legs spread open." The court excluded the statement as having "no probative value at all on the question of how the body lay or that kind of thing."

**320**

mer Navy Yard workers returned to the Navy Yard after their employment terminated.

The question, under *Brown v. United States, supra,* is whether the evidence here adequately links Hampton to the commission of the crime that the trial court erred in excluding and otherwise limiting its use. We uphold the trial court's ruling that all of the proffered evidence did not sufficiently link Hampton to decedent's death. At the most, the evidence indicates friendship between supervisor and employee. There was no evidence of kissing, hand-holding, or any other overt signs of romantic or sexual relationship between decedent and Hampton. Appellant's sole witness in this regard, Richard Tillman, admitted that he had seen Hampton and decedent only talking together, and only during working hours. Moreover, the trial court took pains to allow defense counsel to establish a sufficient evidentiary basis for argument to the jury, several times rejecting the government's motions to preclude or strike evidence. The trial court's various colloquies with defense counsel reveal that it considered and carefully balanced the factors of probative value against prejudicial impact in evaluating this evidence. "The record reflects that the trial court has weighed these factors before reaching its decision to admit or exclude evidence. We will not overturn that decision absent a clear abuse of discretion." *Id.*

Accordingly, appellant's conviction is

*Affirmed.*

NEWMAN, Chief Judge, dissenting:

I would reverse the conviction of first-degree murder on the basis of evidentiary insufficiency. I would also hold that the trial court committed reversible error by the limits it placed on the presentation of evidence linking another person to the murder.