Christopher M. McADOO, Appellant,

v.

UNITED STATES, Appellee.

Dwayne E. WILSON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 83–795, 84–70.

District of Columbia Court of Appeals.

Argued Oct. 3, 1985.
Decided Sept. 24, 1986.

Kenneth Michael Robinson, with whom Timothy P. Junkin, Washington, D.C. was on briefs, for appellant McAdoo.

Nigel L. Scott, Washington, D.C., for appellant Wilson.

Kenneth J. Melilli, Asst. U.S. Atty., with whom Joseph E. DiGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C. were on brief, for appellee.

Before NEWMAN, FERREN and ROGERS, Associate Judges.

FERREN, Associate Judge:

A jury convicted two brothers, McAdoo and Wilson, of first degree murder while armed, D.C.Code §§ 22–2401, –3202 (1981), and carrying a pistol without a license, *id.*, § 22–3204.[1] Both appellants contend the trial court erred in refusing to grant a mistrial after the prosecutor cross-examined Wilson's character witness about his knowledge of Wilson's juvenile adjudications. Appellant McAdoo also asserts his trial counsel was constitutionally ineffective in numerous respects, including counsel's failure to call certain character witnesses, his mishandling of other witnesses, his neglect to investigate leads, and his failure to move for a severance to relieve McAdoo from the taint of his brother's juvenile record and drug use. McAdoo also maintains that the government failed to produce sufficient evidence of premeditation and deliberation to support a conviction of first degree murder.

We agree that the trial court erred in permitting the prosecutor to use Wilson's juvenile adjudications in cross-examining Wilson's character witness. We also agree that McAdoo's trial counsel may have been deficient in several respects. We conclude, however, that neither appellant was sufficiently prejudiced by the revelation of Wilson's juvenile record to require a mistrial. Nor is there a reasonable probability that, but for counsel's deficiencies, the outcome of McAdoo's trial would have been different. Accordingly, we affirm appellants' convictions.

---

1. McAdoo received concurrent prison sentences of twenty years to life for the murder and of one year for the pistol conviction. After a study pursuant to the Federal Youth Corrections Act, 18 U.S.C. § 5010(e), *repealed,* Pub.L. 98–473, Title II, § 218(a)(8), Oct. 12, 1984, Wilson was sentenced under that Act to incarceration for up to twenty years.

## I.

The government's evidence showed that on July 3, 1982, at about 1:00 a.m., Sharon Epps was selling drugs at the intersection of 4th and Elm Streets, N.W. Appellant Wilson purchased some drugs from Epps but gave her $12.00 instead of paying the $15.00 purchase price. Epps returned the money to Wilson and demanded that he return the drugs. Wilson refused, and an argument ensued. Wilson then instigated a fight which ended with Wilson punching Epps in the face, causing injuries for which she received hospital treatment.

The next day, Epps saw Clifford Talley, her cousin. Talley inquired about her injuries, and Epps replied that Wilson had hit her. Talley indicated that he would speak with Wilson to find out why Wilson had hit her. On July 6, 1982, Talley encountered Wilson at Elm and 3rd Streets, N.W., and struck him several times in the face, knocking him to the ground. A witness to the assault, Larry Stevenson, helped Wilson to his feet, and Wilson left the area without assistance.

Later that same night, at approximately 12:30 a.m., Wilson returned to the 300 block of Elm Street, accompanied by his brother, appellant McAdoo. A group from that neighborhood, including Talley, Sandra Epps (a sister of Sharon Epps and a cousin of Talley), and Denice Burroughs, were outside at the time. Both Sandra Epps and Burroughs, who each knew both appellants, saw Wilson enter the area carrying a stick. When Talley saw Wilson and McAdoo running toward him, he attempted to retreat toward an alley. Appellants caught Talley, and witnesses then observed Talley lying on the ground while Wilson beat him repeatedly with the stick and McAdoo kicked his head and face. During the assault, one of the appellants said he was going to kill Talley. When the witnesses approached to intervene on Talley's behalf, McAdoo repeatedly reached for a gun in the pocket of his blue sweat suit as a warning for them to stay clear.

At one point, a witness called the police. Appellants temporarily discontinued their assault, allowing Talley to stagger into an alley and fall to the ground. Both appellants and Sandra Epps followed him into the alley. Although an unidentified third person prevented Epps from approaching Talley, Epps saw both appellants approach and stand over the fallen Talley, at which point McAdoo pointed a gun at Talley and fired one shot at him from close range. Both appellants and the unidentified third man then fled from the area.

When the police arrived, they discovered two live .357 caliber rounds lying near a pool of blood and some brain matter in the alley. Talley was pronounced dead at the hospital. The autopsy revealed he had been killed by a gunshot wound to the head, probably fired from a .38 or .357 caliber weapon. From the gunpowder residue on the entry wound, it was apparent the gun had been within inches of Talley's head when the fatal shot was fired. Talley also had several wounds on his chest and forearms consistent with having been struck by an elongated, patterned stick or club. He also had wounds on his face consistent with a blow by a sneaker or a shoe.

On July 8, 1982, the police executed arrest warrants for both appellants, as well as a search warrant for their home. The police seized a two-piece jogging suit and a blue jacket, both of which Burroughs identified as looking like the clothes McAdoo had been wearing at the time of the murder. Also recovered was a table leg from McAdoo's car which both Sandra Epps and Burroughs identified as looking like the stick Wilson had used to beat Talley and which the medical examiner identified as a weapon consistent with the patterned abrasions on Talley's chest and forearms. At the time of their arrests, Wilson had several bruises on his face, while McAdoo had no apparent injuries.

Appellants offered a different story. McAdoo testified that after hearing about a confrontation between Talley and his broth-

er (Wilson), McAdoo went to Elm Street the afternoon before the murder and spoke with Talley, who assured McAdoo that the situation had been resolved. The two shook hands and separated. McAdoo later ran into Sharon Epps' boyfriend, "Snake," who was carrying a gun in a briefcase. McAdoo tried to tell "Snake" that the incident involving Wilson was now over, but "Snake" would not listen and the two parted after exchanging obscenities.

McAdoo claims that he was playing basketball on the night of the incident and that he was wearing a yellow striped, short-sleeved shirt and bluejean shorts. (McAdoo added that, on the night of the murder, Wilson, not McAdoo, was wearing the blue jacket which the police had seized and Burroughs had identified as McAdoo's.) McAdoo telephoned home and learned that Wilson had been involved in another fight in the Elm Street area. McAdoo returned home and decided to go over to Elm Street with Wilson to resolve the matter.

As they approached 3rd and Elm, McAdoo became scared and cut through an alley, where he picked up a stick. He saw Talley move toward Wilson, so McAdoo ran to cut Talley off. Talley grabbed the stick, causing both Talley and McAdoo to fall to the ground while wrestling for control of the stick. As this was going on, McAdoo contends, a woman yelled directions to someone to "get the gun" and to "shoot him." McAdoo eventually worked the stick free of Talley's grip and struck Talley with the stick until it broke. Someone then grabbed McAdoo, who was able to escape with the aid of Wilson. McAdoo followed Talley into the alley and then heard a gunshot. He did not have a gun himself, however, and did not see anyone else with a gun. McAdoo ran through the alley, eventually meeting Wilson and, after going home, took Wilson to the hospital.

Wilson also testified, first describing the drug sale incident with Sharon Epps. Wilson claimed that on the next day he twice confronted Epps' boyfriend, who on one occasion struck Wilson in the face and

arms with a gun. Wilson also encountered Talley, who instigated a fight, but Wilson left the area after Talley had fallen to the ground. Two nights later, after McAdoo apparently had resolved the matter with Talley, Wilson met Talley and the two shook hands. A short time later, however, Wilson was knocked unconscious from behind. Larry Stevenson and another person helped him home.

Wilson claimed that when he and McAdoo returned to Elm Street, Wilson was wearing cut-off jeans and a blue jacket, and McAdoo was wearing a pullover shirt and cut-off jeans. (Wilson therefore identified the jacket seized by the police as his own, not McAdoo's.) Wilson then said that when he met Talley, Talley asked him if he wanted to see him again, causing Wilson to realize that Talley was the one who had knocked him unconscious earlier that night. Wilson corroborated McAdoo's testimony concerning Talley's and McAdoo's fight over the stick. Wilson maintained that Joyce "Tonnie" McWain was the one who had hollered to someone inside a house to get the gun. Wilson, who did not have a gun and did not see anyone with a gun, then heard a gunshot. He testified that he had never entered the alley and that, after hearing the gunshot, he had run down Elm Street and returned home. Wilson also testified that he did not see Denice Burroughs or Sandra Epps during this incident.

Both appellants called several additional witnesses. McAdoo's defense included the testimony of Tyrone Johnson, Doris Bolden, George Wilson, a police department firearms examiner, Reverend Leeman White, and Joyce McWain. Johnson corroborated McAdoo's testimony that he had been playing basketball late in the evening on July 6 and had been wearing cut-off jeans and a light-colored, pullover shirt. Bolden confirmed that when McAdoo had left home with Wilson in the early morning of July 7, he was wearing jean shorts and a striped, pullover, short-sleeved shirt, not the sweat suit seized by the police. Bolden

testified that Wilson, not McAdoo, left the house wearing the blue jacket seized by the police.

The firearms examiner demonstrated the extent to which a .357 caliber pistol fit within the jacket and pants pockets of the sweat suit seized by the police. Reverend White testified as to McAdoo's reputation in the community as a "very quiet, resourceful young man" whose reputation for peacefulness was "very fine." Finally, McWain was called to testify that, at the time of the murder, there was another male in the alley other than Talley and appellants, although she could not see who fired the shot.

Appellant Wilson's defense included the testimony of Edward Staton, Roland Moss, and Reverend White. Staton testified that he had arrived at the murder scene moments after the shooting but before the arrival of the police, and that neither Denice Burroughs, Joyce McWain, nor Sharon Epps' sister had been "out there" at that time. Moss corroborated Wilson's version of the incident in which Moss had purchased drugs from Sharon Epps. He also confirmed that an individual unknown to Moss assaulted Wilson on a later day. Finally, White testified that Wilson's reputation for peacefulness was as "a very fine young man."

## II.

Both appellants contend the trial court erred in failing to grant a mistrial after the prosecutor had cross-examined Wilson's character witness, Reverend White, about White's knowledge of Wilson's juvenile adjudications.

After White had testified about Wilson's reputation in the community for peacefulness, the prosecutor asked White on cross-examination whether White had heard about Wilson's three juvenile adjudications for burglary, armed robbery, and attempted robbery. White responded that he had not.[2] Neither appellant objected to this cross-examination.

At the conclusion of the testimony of the next witness, the trial judge questioned the use of juvenile adjudications in the cross-examination of character witnesses, indicating he did not know whether that was permissible. He requested counsel for the government and for Wilson to supply authority on the issue. The next day, after argument, counsel moved for mistrials. The court denied the motions, ruling that the prosecutor had properly used Wilson's juvenile record in cross-examining White. When trial resumed, the court read to the jury the standard instruction on cross-examination of character witnesses. (The court substantially repeated this instruction in its final instructions to the jury.)

■ According to common law, the prosecution may not use a defendant's prior trouble with the law, convictions, or ill name among neighbors to establish the probability of guilt of the crime at issue. *Michelson v. United States*, 335 U.S. 469, 475, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948). When a defendant elects to present a character witness on his or her own behalf, however, another rule comes into play. "Not only is he [or she] permitted to call witnesses to testify from hearsay, but indeed such a witness is not allowed to base

2. After Reverend White had testified about what church members, the superintendent of the Sunday School, and the Director of the Board of Education had told him about appellant Wilson, the cross-examination began as follows:

Q. Reverend White, when they told you that, did they tell you that in 1976 he was a juvenile—
A. I didn't ask about any criminal record.
Q. —and he pled guilty to burglary?
A. I didn't ask anybody about any member's criminal records.

Q. Did they tell you when they were speaking of Mr. Wilson's reputation that in 1977 as a juvenile he was found guilty of armed robbery?
A. No, sir.
Q. Did they tell you that in 1978 as a juvenile he was found guilty of attempted robbery?
A. I never asked any questions.
Q. They never came up during the conversation?
A. No, sir.

his [or her] testimony on anything but hearsay." *Id.* at 477, 69 S.Ct. at 219. The witness cannot testify as to the defendant's specific acts or to the witness' knowledge or independent opinion of these acts. Rather, the witness is "allowed to summarize what he [or she] has heard in the community, although much of it may have been said by persons less qualified to judge than himself [or herself]." *Id.*

■■■ In this context, the prosecution can test the foundation and reliability of the witness' direct testimony by asking whether the witness had heard of particular events, "including arrests and convictions of the defendant, which are inconsistent with defendant's enjoying a good reputation regarding the character trait or traits to which the witness has testified." *Morris v. United States,* 469 A.2d 432, 435 (D.C.1983) (citation omitted). Thus, while a defendant has the option to show that his or her reputation reflects a life incompatible with the commission of the offense charged, such proof is subject to tests of "credibility designed to prevent him [or her] from profiting by a mere parade of partisans." *Michelson,* 355 U.S. at 479, 69 S.Ct. at 220. The trial court has wide discretion to control cross-examination, however, and must protect the defendant against misuse of this discrediting practice. *Id.* at 480, 69 S.Ct. at 220.

The present case concerns cross-examination of a character witness not about the defendant's criminal convictions but about his juvenile adjudications, a situation presenting additional considerations. Generally, a witness may not be impeached with his or her own juvenile record. *Smith v. United States,* 392 A.2d 990, 993 (D.C. 1978). *Cf. Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Tabron v. United States,* 410 A.2d 209, 212 (D.C.1979). The reasoning behind this rule is that a juvenile adjudication is not the equivalent of a criminal conviction and thus "does not have the same tendency to demonstrate his [or her] unreliability as does a criminal conviction for the adult offender."

*Brown v. United States,* 119 U.S.App.D.C. 203, 207, 338 F.2d 543, 547 (1964). These records should not " 'become the basis for criminal records, which could be used to harass a person throughout his [or her] life.' " *Id.* (quoting *Thomas v. United States,* 74 U.S.App.D.C. 167, 171, 121 F.2d 905, 909 (1941)). Furthermore, a statute mandates confidentiality of juvenile case records. D.C.Code § 16–2331 (1981). *See also* D.C.Code § 16–2316(e) (excluding the general public from hearings arising under this subchapter) and *id.,* § 16–2335 (sealing of juvenile records).

■■ Given these differences between juvenile adjudications and criminal convictions, we conclude—on an issue where courts are divided—that a defendant's juvenile adjudications may not be used for impeachment of a defendant's character witness. *Compare State v. Holzworth,* 201 Mont. 54, 651 P.2d 1255 (1982) (state may under no circumstances refer to defendant's juvenile offenses while cross-examining character witnesses), *with Lineback v. State,* 260 Ind. 503, 301 N.E.2d 636 (1973), *cert. denied,* 415 U.S. 929, 94 S.Ct. 1440, 39 L.Ed.2d 487 (1974) (prosecutor may inquire whether character witness knows about prior juvenile adjudication).

Even though the purpose of using such adjudications on cross-examination is to test the credibility of the character witness, not to enhance the evidence of the defendant's guilt, such use of these adjudications is likely to be highly prejudicial to the defendant precisely because of their confidential nature. More specifically, our statutory policy of protecting the confidentiality of these records makes it likely that character witnesses, when asked whether they have heard members of the community speak about a defendant's juvenile adjudications, will answer in the negative. That answer may cause the jury to question the witness' reliability in reporting the defendant's reputation, *see Michelson,* 355 U.S. at 483, 69 S.Ct. at 222, even though the witness (as well as others in the community) may have had no real opportunity

to hear about these adjudications—especially in a case such as this one where Wilson's adjudications were five, six, and seven years old, respectively.

■ Accordingly, cross-examination of a character witness about a defendant's juvenile record has no legitimate probative value because the witness likely will have had little, if any, opportunity to hear people talk about it; and yet the suggestion of such a record is highly prejudicial not only because it discloses confidential records but also because it plants an impression which the character witness is not in a position to counteract.

■ Nonetheless, we also conclude the trial court did not abuse its discretion in declining to grant a mistrial. *See Hallman v. United States,* 410 A.2d 215, 217 (D.C. 1979) (on motion for mistrial, court has "broad discretion"); *Middleton v. United States,* 401 A.2d 109, 127 (D.C.1979) (mistrial motion subject to court's "sound discretion"). The court instructed the jury to use the information about Wilson's juvenile record solely to evaluate the strength of White's character testimony. Because of White's ignorance of Wilson's juvenile record, the jury may have given less weight to his character testimony than it would have otherwise, but White's character reference for Wilson was unimpressive at best—merely "a very fine young man." Given the eyewitness testimony about Wilson's guilt, there is no reasonable probability that unimpeached testimony of White would have affected the outcome at trial for Wilson.

■ McAdoo's claim of prejudice attributable to White's cross-examination is more attenuated. He claims prejudice because the jury would have attributed the bad character evidence not only to Wilson but also to McAdoo. This argument presupposes both that the jury disregarded the court's instructions and that the jury was unable to distinguish the evidence against one appellant from that against the other. In any event, McAdoo has no stronger basis than Wilson for asserting that the trial court abused its discretion in not declaring a mistrial.

### III.

Appellant McAdoo also contends he was denied his sixth amendment right to effective assistance of counsel. In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth a constitutional standard for review of ineffective assistance claims. In this court's opinion in *White v. United States,* 484 A.2d 553 (D.C.1984), we noted that the *Strickland* test has two components:

> "First, the defendant must show that counsel's performance was deficient ... The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* [466 U.S.] at [687–88] [, 104 S.Ct. at 2064–65]. The second requirement is that "the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* [466 U.S.] at [687] [, 104 S.Ct. at 2064]. In sum, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* [466 U.S.] at [695] [, 104 S.Ct. at 2068].

*White,* 484 A.2d at 558 (quoting *Strickland*). In this type of analysis, the Supreme Court noted that "[j]udicial scrutiny of counsel's performance must be highly deferential.... [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

Keeping this framework in mind, we address the various acts and omissions of counsel that appellant alleges were the result of deficient professional judgment—judgment so prejudicial there is a reasonable probability that, but for the errors, the jury would have acquitted.

## A.

McAdoo makes two related charges: that his trial counsel was constitutionally ineffective (1) in failing to raise a contemporaneous objection to the prosecutor's use of Wilson's juvenile adjudications in the cross-examination of Reverend White, and (2) in failing, in any event, to move for a severance of defendants' trials both before and after the jury had learned of co-defendant Wilson's juvenile adjudications. We have already held that the trial court did not abuse its discretion in declining to grant a mistrial based on the prosecutor's use of Wilson's juvenile adjudications. McAdoo's ineffectiveness of counsel argument, therefore, presupposes that the trial court would or should have granted a mistrial if counsel had pressed the issue earlier (instead of responding to the court's *sua sponte* concerns) and had highlighted McAdoo's interest rather than allowing the focus to remain on Wilson.

■ We consider, first, counsel's failure to object to the prosecutor's cross-examination. Although we have held, *supra* Part II., that such use of juvenile adjudications in cross-examining a character witness was improper, at the time of the trial there was no local caselaw on the subject; indeed, there was caselaw from other jurisdictions permitting such questions, even about a juvenile's prior arrests. *See, e.g., Stepheny v. State,* 570 S.W.2d 356, 359 (Tenn. App.1978); *Love v. State,* 533 S.W.2d 6, 10 (Tex.Crim.App.1976). Accordingly, a failure to object to this practice was not "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. And, as it turned out, any objection by counsel would have been unavailing. Although the trial court raised the issue *sua sponte,* after briefing and argument the court ruled for the government.

We turn to the question of severance. The general rule is that defendants charged with jointly committing a crime are to be tried together. *Baxter v. United States,* 352 A.2d 383, 385 (D.C.1976); *United States v. Gambrill,* 146 U.S.App.D.C. 72, 83, 449 F.2d 1148, 1159 (1971). Pursuant to Super.Ct.Crim.R. 14, the trial court may grant a severance if it appears that a defendant is prejudiced by a joint trial. However, severance is appropriate only when a joint trial is manifestly prejudicial, and the defendant bears the burden of demonstrating such prejudice. *Christian v. United States,* 394 A.2d 1, 20 (D.C.1978), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979).

■ Appellant McAdoo claims he meets this burden. He asserts counsel should have anticipated that his brother's drug use, as well as the potential impeachment of Wilson's character witnesses with his juvenile adjudications, would be prejudicial to McAdoo, implying guilt by association. Thus, says McAdoo, his counsel should have resisted joinder or at least moved for a severance upon disclosure of Wilson's juvenile record to the jury. According to McAdoo, he was "forced to bear the prejudicial effect of evidence establishing his association by blood, family, and concerted action with a proven violent criminal and PCP abuser."

Any prejudice caused by association with his brother, however, was not "manifestly prejudicial," *see Christian,* 394 A.2d at 20, for two reasons. First, the trial court instructed the jury to limit the juvenile-adjudication impeachment to Wilson. Second, manifest prejudice warranting severance occurs only when the evidence of a defendant's complicity is infinitesimal in comparison with the evidence against the co-defendant. *Id.* at 21. In this case, the evidence against McAdoo was at least equal to, and perhaps even greater than, the evidence against Wilson. McAdoo was the person seen firing the gun. In short, although McAdoo theoretically had a basis for seeking a severance—whether Wilson's juvenile adjudications were properly or improperly used to impeach Reverend White's character testimony for Wilson—it does not appear that there was sufficient prejudice

to McAdoo to mandate a severance if counsel had asked for one.

Furthermore, McAdoo's complaint does not account for the possibility that there was a sound tactical reason for electing not to move for a severance. As McAdoo acknowledges, he and Wilson testified to basically the same version of the events, thereby corroborating one another. Indeed, Wilson acknowledged the jacket ascribed to the gunman was his, not McAdoo's. Had the trials been severed, resulting in a mistrial, there would have been no guarantee that Wilson's testimony would have been available to McAdoo, for unless Wilson were retried before McAdoo, Wilson might exercise his privilege against self-incrimination by refusing to testify in McAdoo's trial. (It is unlikely that the trial court would have severed the case against McAdoo while continuing the trial against Wilson; if the prejudice against McAdoo from the revelation of Wilson's juvenile adjudications warranted a severance for McAdoo, there would have been even greater reason for declaring a mistrial for Wilson himself.) Perhaps McAdoo's point is that in no event would competent counsel have wanted Wilson to testify in McAdoo's trial. But that is speculative. Given the strength of the government's case, it is not for us to second-guess how best to defend McAdoo.

In sum, we cannot say that counsel fell below "prevailing professional norms," *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065, in failing to make a contemporaneous objection to the prosecutor's use of Wilson's juvenile adjudications or in failing to move for a severance. In any event, given no manifest prejudice to McAdoo, we do not believe, on this record, there is a reasonable probability that, absent counsel's alleged tactical deficiency, the jury "would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. at 2068. The government's case against McAdoo was too strong.

## B.

McAdoo also asserts that his trial counsel was professionally deficient in failing to interview and call character witnesses. McAdoo had given counsel a list of nine character witnesses he wanted to have testify, but counsel called only one of them at trial, the Reverend Leeman White. The list included three Langston University officials, including the President, from Oklahoma City, where McAdoo had attended college; Mr. Waverly Jones, the principal of Cardozo High School in the District, where McAdoo had attended high school; and four other persons who resided locally: Mr. and Mrs. Young (two of McAdoo's neighbors); Ms. Loff ("a lady who sort of acted like our mother since the death of my mother"); and Eugene Blackwell (a friend from Cardozo High School days and McAdoo's college roommate).

According to McAdoo's trial counsel, who testified at the hearing on the motion for new trial, McAdoo had asked him to contact these persons for the purpose of testifying as to McAdoo's reputation. Counsel, however, had decided not to contact the three Oklahoma witnesses, believing they would not be of substantial aid to McAdoo's defense because none of them had seen McAdoo for at least nine months and, in any event, none "had contact with him in the community. And it was my feeling that their weight and their knowledge of him in this community would not qualify them." The record reveals that counsel did contact the other six potential witnesses and that three of them—White, Jones, and Blackwell—were subpoenaed and present at trial. Only White testified, however. When counsel had interviewed Jones, he discovered that Jones did not know of McAdoo's reputation in the community and thus could not qualify as a character witness. There is no record basis for knowing why Blackwell, who was at the trial, was not called to testify. Nor is there a record basis for knowing why Ms. Loff had not been subpoenaed. Counsel had not subpoenaed Mr. and Mrs. Young, however, be-

cause, according to counsel, "they were reluctant to get involved."

As a general proposition, the decision to call, or not to call, a character witness is a tactical decision, *Morris v. United States*, 469 A.2d 432, 437 n. 1 (D.C.1983), which should not be measured by success, or lack of success, at trial, *id.; Tillery v. United States*, 419 A.2d 970, 972–73 (D.C.1980). On the other hand, although our scrutiny of counsel's tactical decisions "must be highly deferential," *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, counsel obviously must be accountable for following up investigative leads supplied by the client. "Even according due deference to counsel's professional judgment, trial counsel has an obligation, particularly where credibility is the key issue, to determine whether character witnesses are, in fact, available and could be qualified, and the failure to do so cannot be excused as a tactical decision." *Curry v. United States*, 498 A.2d 534, 544 (D.C.1985).

According to his testimony at the post-trial hearing, McAdoo gave his attorney a list of potential character witnesses "from every aspect of my life, from high school, from the neighborhood, ... from college." He did so "[b]ecause I knew if I would get somebody to say what kind of person I was, I would really make myself more believable in the eyes of the jury." We are therefore troubled by counsel's apparently arbitrary decision not even to talk with the three potential witnesses from Oklahoma, for there is no reason why a jury automatically would discredit university officials from another community where McAdoo had resided a year or so earlier.

On the other hand, counsel's experience with the local witnesses showed that McAdoo's expectations were, to a considerable extent, misplaced. Counsel discovered that the principal of Cardozo High School, Mr. Jones, simply could not verify McAdoo's reputation, and that McAdoo's neighbors, the Youngs, would not get involved. Moreover, when counsel first attempted to qualify the Reverend White, he failed to do so because, apparently, White could speak only from his personal experience, not about McAdoo's reputation in the community. (Counsel was permitted to recall White later; he testified that McAdoo's reputation was "very quiet, resourceful ... very fine.") The record is silent as to why counsel did not call Blackwell or even subpoena Ms. Loff, but in view of the difficulty of getting some local witnesses proffered by McAdoo to provide character testimony, we cannot infer that counsel's decision not to call others with whom he spoke was necessarily unsound.

For the sake of argument we shall assume that counsel's failure to contact the Oklahoma witnesses, at McAdoo's request, was a violation of professional norms—a deficient performance within the meaning of *Strickland*. There is no conclusive indication that counsel's judgment with respect to local witnesses was deficient.

In any event, when we address the second *Strickland* criterion—prejudice— we conclude that appellant has not proved his case. There is no evidence that any of the uncalled character witnesses, Oklahoma or local, would have provided favorable testimony for McAdoo. McAdoo did not subpoena, or even proffer affidavits from, *any* of these witnesses for the post-trial hearing.[3] McAdoo had a responsibility to show "there is a reasonable probability" that, but for counsel's failure to call the character witnesses, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at

---

**3.** At the post-trial hearing, appellant's new counsel stated that "we are not required to produce those witnesses at this point." The court noted that the prosecutor wanted to develop the fact that the witnesses would not be able to give an opinion. Counsel replied, "[T]hen let [the prosecutor] bring them in if he is going to prove that." The prosecutor noted that it is not the government's burden to bring them in and the court replied, "I think it is fairly apparent that they are not here today." Counsel acknowledged that the witnesses had not been subpoenaed for the hearing.

2068. He did not do so. Especially in light of proof that some of the witnesses McAdoo proffered could not have helped him, there is no basis for inferring—absent a record basis at the post-trial hearing—that the other uncalled witnesses could have helped him, either.

### C.

McAdoo also asserts that his trial counsel failed to pursue an investigative lead. Counsel had learned that an alleged contract killer had murdered Talley's brother, and that this killer had made statements indicating he also might know something about the shooting of Talley. Counsel conveyed this information to McAdoo and indicated he would pursue this possible lead that the contract killer, himself, had murdered Talley. Counsel, however, was unable to discover any evidence that would have been admissible at trial. He encountered only hearsay—street rumors in conversations with several persons.

McAdoo complains that counsel did not speak directly with this "contract killer" or with his lawyer, despite McAdoo's explicit request that he follow up that lead. Given the implausibility of the "contract killer" admitting his own guilt to exonerate McAdoo, counsel's judgment that an interview with this person was not warranted was certainly "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. McAdoo's counsel at the post trial hearing effectively conceded as much when he declined the trial court's invitation to produce this witness at the hearing; counsel acknowledged he "wouldn't expect a person to come in and admit to" the murder. Again, McAdoo's failure to produce this witness or any evidence as to this proposed testimony, precludes the finding

of professional deficiency, let alone prejudice, required by *Strickland.*

### D.

Appellant also argues that his attorney was ineffective in deciding to call certain witnesses and in failing adequately to prepare the witnesses he did call. The first witness called in McAdoo's defense was McAdoo himself. McAdoo characterizes this decision as "a strong indication of either inexperience or stupidity on the part of trial counsel." This decision, however, apparently was tactical, for it made sense in view of the fact that the testimony of McAdoo's other witnesses was relevant primarily in corroborating details of McAdoo's own testimony. The testimony of McAdoo's other fact witnesses would have had less value to the defense case if the jury had not already heard from McAdoo.

The second witness, George Wilson, apparently was called to demonstrate how a .357 caliber pistol would not fit into the jacket pocket of the sweat suit McAdoo allegedly wore on the night of the shooting. Although this witness, as it turned out, actually demonstrated that the gun did fit into the pants pocket and, as McAdoo contends, may have hurt McAdoo's case, another purpose of this testimony, according to counsel, was to demonstrate that the lightweight material of the pants could not support the weight of the gun. At trial, McAdoo's counsel told the jury to notice how the suit sagged. "You will notice if you examine the suit it is light weight material, has a draw string in it. You put two pounds in that pocket and we offer that the pants come off." Thus, trial counsel's decision to call the witness at least was rationally calculated to aid his defense, even if its principal purpose was frustrated.[4]

---

4. McAdoo implies that his trial counsel failed adequately to prepare Tyrone Johnson, who corroborated McAdoo's testimony that they had played basketball the night before the murder and also corroborated McAdoo's testimony concerning his clothing. Johnson's testimony differed from McAdoo's only in that Johnson testified they "went around to the pool" before McAdoo left for home. McAdoo complains that this difference in a small detail indicated that Johnson was inadequately prepared by counsel. It is not clear how counsel could have "prepared"

Appellant also asserts that Reverend White, the character witness, was inadequately prepared and that this severely prejudiced his case. Counsel was unable to qualify White as a character witness the first time he called White to testify; White apparently did not understand what general reputation, as compared with his personal knowledge, meant. Counsel testified at the post-trial hearings, however—and no reason was proffered to doubt him—that he had prepared White properly, making clear that general reputation, not personal knowledge or opinion, was the issue. As a result, counsel was satisfied that White would qualify as a character witness and give favorable testimony. White's confusion on the stand, therefore, is more indicative of White's inadequacies as a character witness than of ineffectiveness of counsel. In any event, White was later recalled, qualified as a character witness for both McAdoo and Wilson, and offered favorable testimony for both. Thus, McAdoo was not prejudiced, to any discernible extent, by any inadequacy of counsel in preparing White to take the stand.

The final witness called by McAdoo's trial counsel was Joyce McWain. She had been listed in Officer Donohoe's police report as the person who had reported the incident. The report stated that Talley "was approached by two subjects who began beating him with sticks. They then pulled him into the alley where a *third subject appeared and shot C–1* [*Talley*] in the head with a handgun." (Emphasis added.) The report did not indicate which part

McAdoo had played in the incident.[5] At a later point in the report, however, McWain was listed as a witness only to "the fight which preceded the shooting." Thus, the report did not unquestionably indicate that McWain actually had witnessed the shooting or that any information she had given the police concerning who shot Talley was based upon her personal knowledge. In fact, McWain had testified before the grand jury that she did not personally know who had done the shooting. Defense counsel was aware of this testimony and able to interview McWain before she testified at trial.

At trial, McWain testified that she had witnessed appellants' assault upon Talley, who then had gone into the alley followed by appellants and Sandra Epps. McWain also testified that she had seen an unidentified person in the alley (as Sandra Epps herself had testified). McWain then heard a gunshot from the alley, but she did not see who fired the shot. She also testified that she did not recall what she had told the police because she had been upset. On redirect examination, McAdoo's counsel attempted to impeach McWain with the police report, an apparent effort to establish that she once had said the unidentified man had shot Talley. The trial court, however, sustained the government's objection, ruling that the report was not a statement of the witness since she had neither prepared nor read it.

Appellant McAdoo makes several complaints about his lawyer's handling of this

Johnson to avoid this discrepancy; it is not uncommon for witnesses to have differing recollections of events, and counsel is not permitted, let alone required, to suggest that a witness testify otherwise.

Appellant also contends that the testimony of Doris Bolton was irrelevant. This allegation is incorrect because she corroborated McAdoo's testimony as to how he learned of Wilson's beating and, more importantly, confirmed McAdoo's claim that the clothes he wore that night were not the clothes witnesses saw on the gunman.

In addition, McAdoo complains about counsel's decision to call Edward Staton. Staton was called as a witness for co-defendant Wilson.

Whatever complaints McAdoo has concerning this witness, therefore, are altogether irrelevant to his claim of ineffective assistance of his own counsel.

5. The government argues that one possible interpretation of the report language is that one of the original two men fired the shot. (Presumably, the government is suggesting that the antecedent to "Shot C–1" may have been "they," not "third subject.") Such an interpretation is plausible, the government argues, given the short space alloted on the form and given the fact that this form does not represent a signed statement from the witness.

witness. He charges that his lawyer was ineffective for failing to call McWain in McAdoo's case-in-chief rather than calling her after the co-defendant had presented his case. The decision to delay calling McWain, however, may have been a tactical decision based on the hope that the government would call her as a witness and then defense counsel would have been allowed to cross-examine. Moreover, McAdoo articulates no prejudice from the timing of McWain's testimony.

McAdoo also suggests that counsel failed to "examine Joyce McWain to establish what she told Officer Donohoe." That is correct. As indicated above, counsel asked McWain about this and she replied she did not remember. In any event, McAdoo's counsel could not have impeached McWain with the police report because she was McAdoo's own witness, and there was no basis for claiming surprise. See D.C.Code § 14–102 (1981). Here, McAdoo's counsel did not and could not claim surprise by McWain's testimony that she did not see who had shot Talley, for counsel had been apprised of her grand jury testimony to that effect and had interviewed her immediately before her testimony at trial. Thus, counsel was not ineffective for failing to impeach McWain with the police report. Indeed, McAdoo's appellate counsel do not suggest how trial counsel could have properly placed Officer Donohoe's police report before the jury, contrary to the trial court's ruling.

McAdoo also contends that counsel should have called Officer Donohoe to testify as to what McWain had told him. Such

testimony, however, would have been inadmissible hearsay. Furthermore, McAdoo failed to produce any evidence at the post-trial hearing (other than the somewhat ambiguous police report) that, if called, Donohoe would have testified that McWain had indicated she had personally witnessed someone other than McAdoo shoot Talley.

■ In sum, McAdoo's various complaints about his trial counsel's handling of defense witnesses do not reveal serious deficiency, within the meaning of *Strickland*. Moreover, whether considered individually or in combination, McAdoo's charges of ineffectiveness in the handling of defense witnesses relate to matters which do not allow for the reasonable probability that, but for the actions complained of, the outcome of the trial would have been different. *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068.

**E.**

■ McAdoo also claims his trial counsel failed to act as an effective advocate in the courtroom.[6] Among other things, McAdoo complains that his counsel did not question the government witnesses concerning their prejudice against appellant and their fondness for the decedent. The jury, however, was aware of the witnesses' close relationship to Talley, and, as to the supposed prejudice against McAdoo, the record does not suggest that any existed. McAdoo himself acknowledged this. Thus, there is no real basis for the allegation that trial counsel overlooked a fruitful avenue of bias cross-examination.[7]

6. Appellant presents several examples which have no merit. He claims that counsel failed to object to the government's numerous leading questions to government witnesses, but he can only point to three instances. Even if objections had been sustained, the result would have been an alteration of the form of the questions. Appellant also contends that his counsel failed to file a motion to suppress or limit introduction of certain physical evidence and identifications before trial. In fact, however, the physical evidence taken from McAdoo's home was seized pursuant to a search warrant, and McAdoo consented to the search of his car. As to the identi-

fications, there is no indication that there were any pretrial identification procedures conducted by the police; thus, there could not have been any suggestivity. Nor was the identification evidence in the government's case-in-chief inherently "so weak that a jury could not resolve the identity issue against the accused beyond a reasonable doubt." *United States v. Brannon*, 404 A.2d 926, 930 (D.C.1979).

7. McAdoo also argues that his attorney should have cross-examined the government witnesses as to certain weaknesses in their testimony, such as (1) Denice Burrough's statement that a

McAdoo maintains that counsel should have requested Instruction 2.53 of the Criminal Jury Instructions for the District of Columbia after the trial court had invited him to request it. This instruction governs evidence admitted against one defendant but not against another defendant. The trial court declined to give that instruction, however, following the prosecution's expression of concern that it would be inconsistent with the court's instruction on aiding and abetting. McAdoo urges that this instruction was necessary, given the evidence of drug-related activities and the information presented concerning Wilson's juvenile adjudications. The court, however, twice instructed the jury to limit its consideration of Wilson's juvenile adjudications to evaluating the reliability of White's character testimony on behalf of Wilson alone. In any event, we cannot say that counsel was responsible for the trial court's failure to give the instruction.

McAdoo's final argument is that his trial counsel's theory of defense, that of misidentification, was meaningless and irrelevant. Counsel testified at the hearing on the motion for a new trial that he believed the government's witnesses had identified the gunman solely on the basis of clothing and in so doing had juxtaposed McAdoo and Wilson. McAdoo points out, however, that he and his brother had been charged together in one count with the first degree murder of Talley and, therefore, that each was potentially liable as a principal under the aiding and abetting theory, even if the other defendant had done the shooting. McAdoo claims, therefore, that the fact the witnesses may have confused him with his brother did not diminish the government's case against both of them or enhance McAdoo's defense that someone else fired the shot.

McAdoo's defense, however, was not merely that, at worst, he occupied the abettor role the witnesses assigned to Wilson but, rather, that he was not involved at all in the shooting. Appellants, however, did not deny that they both had been present at the scene of the beating and near the scene of the shooting. Trial counsel therefore realized that McAdoo's "no involvement" defense would have little chance of success as long as the evidence put the murder weapon in McAdoo's hand. It was therefore critical to McAdoo's defense to disassociate McAdoo from the role of the gunman. The only possible way to accomplish that was by putting on the evidence that the witnesses had juxtaposed the roles of appellants, including the evidence that Wilson, not McAdoo, was wearing the clothes described as the gunman's. Thus, trial counsel's theory of defense, although not as strong a defense as appellant may have wished, was not unsound, given the government's evidence.[8]

We acknowledge, in conclusion, that although we find no violation of McAdoo's constitutional right to effective assistance of counsel, his trial counsel's performance may have been deficient in several respects. Given *Strickland*, however, we must conclude that counsel's alleged transgressions, either singly or taken together, do not rise to the level of prejudicing the defense to the extent that appel-

bystander she was talking to was delivering flowers after midnight, (2) Sharon Epps' conviction for false pretenses, and (3) Dr. Stuart Dawson's use of notes during his testimony. The specific areas identified are so trivial as to preclude any reasonable possibility that they would have affected the outcome of the trial. McAdoo also contends that counsel failed to cross-examine Dr. Dawson on the effect that PCP in Talley's blood would have had on the decedent while fighting with appellants. Dawson already had testified, however, that he had no "way of knowing what [Talley's] behavior was as a result of the drug."

**8.** McAdoo also complains that his trial attorney failed to file a timely motion for a new trial. It was not unreasonable for trial counsel to leave to McAdoo's new attorney the task of preparing and filing a motion alleging ineffective assistance of trial counsel. In any event, McAdoo obviously was not prejudiced by the untimeliness of his motion, for the trial court accepted the motion, held an evidentiary hearing, and ruled on the merits.

lant was deprived of a fair trial, "a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

## IV.

McAdoo also contends the government failed to produce sufficient evidence of premeditation and deliberation to support a conviction of first degree murder. We disagree. We noted in *Jones v. United States*, 477 A.2d 231 (D.C.1984), that our standard of review is " 'whether there was sufficient evidence from which a reasonable juror could fairly conclude guilt beyond a reasonable doubt.' " *Id.* at 236 (quoting *Head v. United States*, 451 A.2d 615, 622 (D.C.1982)).

> In applying this standard, we do not distinguish between direct and circumstantial evidence. *Jackson v. United States*, 395 A.2d 99, 102 (D.C.1978); *Byrd v. United States*, 388 A.2d 1225, 1229 (D.C. 1978). We also review such claims in the "light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *Hall v. United States*, 454 A.2d 314, 317 (D.C.1982); *Curley v. United States*, 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). This court can reverse only where the government has produced no evidence from which a reasonable mind might infer guilt beyond a reasonable doubt. *Frendak v. United States*, 408 A.2d 364, 371 (D.C.1979).

*Id.* Measured against this standard, the evidence of premeditation and deliberation was more than sufficient.

■ To prove premeditation, the government must show that a defendant, before acting, gave thought to the idea of taking a human life and reached a definite decision to kill, while deliberation is proved by demonstrating that the accused acted with consideration and reflection upon the preconceived design to kill. *See Hall v. United States*, 454 A.2d 314, 317 (D.C. 1982); *Frendak v. United States*, 408 A.2d

364, 371 (D.C.1979). Premeditation and deliberation may be inferred from surrounding facts and circumstances. *Hall*, 454 A.2d at 317; *Byrd v. United States*, 388 A.2d 1225, 1230 n. 5 (D.C.1978); *Harris v. United States*, 375 A.2d 505, 508 (D.C. 1977).

The jury reasonably could have concluded from the evidence that McAdoo, along with his brother, left home and went to Elm Street in the early morning of July 7 with the preconceived design to kill Talley. Several facts support this conclusion. By all accounts, McAdoo was acting in response to the beating inflicted by Talley upon Wilson the previous day. Such prior hostilities "may support a conclusion that the defendant acted under the impetus of calm reflection rather than impulse." *Harris*, 375 A.2d at 508. Moreover, this prior confrontation between Talley and Wilson provided McAdoo with a motive for Talley's killing, thereby "suggest[ing] a purposeful or reasoned killing." *Hall*, 454 A.2d at 317.

The jury also reasonably could have found that McAdoo carried the murder weapon to the scene of the crime. "This, in itself, is highly probative of premeditation and deliberation," *Frendak*, 408 A.2d at 371, as it "permits the inference that appellant arrived on the scene already possessed of a calmly planned and calculated intent to kill." *Hall*, 454 A.2d at 318 (quoting *Belton v. United States*, 127 U.S.App.D.C. 201, 203, 382 F.2d 150, 153 (1967)).

■ The jury also reasonably could have concluded that the manner and circumstances of the decedent's death evidenced a "planned and calculated intent to kill." *Hall*, 454 A.2d at 318 (quoting *Belton*, 127 U.S.App.D.C. at 203, 382 F.2d at 153). Upon arriving at the scene, McAdoo and Wilson entered into an altercation with Talley, without any immediate provocation. After Talley had been beaten badly, staggered into the alley, and fell to the ground, McAdoo stood over him and shot him in the head from very close range. This sequence of events plainly evidenced the implementa-

tion of a calculated plan. *See Head,* 451 A.2d at 623 (fact that decedents were shot in head at close range as they lay face down on ground "gives rise to an inference of a calculated plan rather than an impulsive act").

Finally, the jury reasonably could have concluded that McAdoo's premeditated and deliberated plan to kill Talley was evidenced verbally during the course of the assault upon Talley. Sandra Epps heard either McAdoo or Wilson tell Talley that they were going to kill him. In either case, the jury reasonably could have inferred that this was an expression of appellants' joint design. For all these reasons, therefore, the evidence was sufficient for a reasonable juror to conclude beyond a reasonable doubt that McAdoo killed Talley with premeditation and deliberation.

*Affirmed.*