Milton MILLS, Sr., Appellant,

v.

UNITED STATES, Appellee.

No. 89–630.

District of Columbia Court of Appeals.

Argued Jan. 10, 1991.
Decided Aug. 21, 1991.
Rehearing Denied Jan. 15, 1992.

Allen W. Levy, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Steven N. Gersten, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John R. Fisher, Helen M. Bollwerk and David Schertler, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and SCHWELB and WAGNER, Associate Judges.

SCHWELB, Associate Judge:

Following an eight day jury trial before Judge Reggie Walton, appellant Milton Mills was convicted of two counts of first degree murder while armed, in violation of

D.C.Code §§ 22–2401, –3202 (1989); one count of threats, in violation of D.C.Code § 22–2307 (1989); two counts of sodomy, in violation of D.C.Code § 22–3502 (1989); one count of rape while armed, in violation of D.C.Code §§ 22–2801, –3202 (1989); and one count of armed robbery, in violation of D.C.Code §§ 22–2901, –3202 (1989). On May 29, 1989, Mills was sentenced by Judge Robert Shuker to two consecutive terms of twenty years to life on the murder counts and to consecutive terms of imprisonment on the remaining counts. On appeal, Mills' principal contentions are that the government failed to produce sufficient evidence of premeditation and deliberation to support a conviction of first degree murder and that misconduct on the part of the prosecution influenced the jury to return a verdict of guilty for first degree, rather than second degree, murder. We hold that the evidence was sufficient to support the jury's verdict and that, although the prosecutor improperly argued some facts not in evidence and made several inflammatory comments to which no objection was made, this was not sufficient under all of the circumstances to warrant reversal of Mills' convictions or to reduce the first degree murder counts to second degree murder. Accordingly, we affirm.

## I

## THE EVIDENCE

### A. The Government's Case.

This tragic case presents us not with a single "murder most foul and most unnatural," but with two. The prosecution presented evidence, which was obviously credited by the jury, from which reasonable persons might infer that Mills took a hammer from its customary place in the kitchen to the bedroom for the purpose of brutally murdering his six-year-old son and ten-year-old stepdaughter. He subsequently raped, sodomized, threatened and robbed a 15–year–old stepdaughter, brandishing a kitchen knife to enforce his will. His mo-

tive for these crimes, reasonably inferable from his statements to the dead children's mother before the murders and to their sister thereafter, was vengeance. The mother was terminating her relationship with Mills, and Mills believed that she was involved with another man.

Until May 20, 1988, Mills had been living at 1650 Fuller Street, N.W. with Odella Hughes and her three children, Sophia Sanders, Dorothy (Janelle) Hughes and Milton Mills, Jr. (Junior). Junior was the son of Appellant Mills, while the two girls were fathered by other men.

Sophia Sanders, who was then in the eleventh grade, testified that she returned home from her job at a clothing store on May 20, 1988 at approximately 8:30 p.m. She saw Mills leaning out of the apartment window. Mills shouted "Hi sweetheart!", or words to that effect.[1] Sophia testified that she did not expect to find her mother at home, for she knew that her mother and Mills had been having problems. Indeed, Sophia was aware that her mother had told Mills that if she did not come home after work on his birthday, which fell on May 20th, Mills should take her absence as a signal that she wanted him out of the apartment.

When Sophia entered the apartment, she heard loud music and noticed that the television was also turned on at a high volume. Mills told her that Junior and Janelle were "downstairs at the African girl's [apartment]." Mills then asked Sophia whether she had a birthday card for him. Sophia said she had, but that she had not yet signed it. She signed the card and handed it to Mills. It was to be the last friendly moment between the two of them.

Mills told Sophia that he had a surprise for her, and told her to close her eyes. When Sophia did so, Mills proceeded, without any warning, to strike her in the mouth with his fist. As a result of the unexpected blow, Sophia fell to the floor and defecated in her clothing. She began to scream and tried to run out of the locked

---

**1.** A neighbor testified that he heard Mills shout "How are you doing, sexy?" or "How are you doing, good-looking?"

apartment. Mills responded by knocking the terrified girl to the floor once again and by placing one hand over her mouth and the other on her throat. When Sophia continued to scream, Mills began hitting her with a pillow and threatened her with a marble ashtray.

According to Sophia, Mills next ordered her to undress. He told her that if she did not do so, he would kill her and her mother, sister, and brother. Afraid to disobey, Sophia took off all of her clothes except for her knee-high stockings and her brassiere. Mills likewise removed all of his clothes except his socks. Sophia testified that Mills threatened to cut her if she did not calm down.

As Mills proceeded with his assault by ripping off Sophia's brassiere, the telephone rang. Mills left Sophia momentarily and answered the call. He then went into a bathroom and emerged with a steak knife. Displaying the weapon to Sophia, he warned her not to make him use it. He then took Sophia into her bedroom and demanded to know whether she had any money. Sophia gave him $63.00. Mills' response was "Good, this is going to get me where I got to go when I finish."

Mills threw the money on the floor and then sodomized and attempted to rape Sophia. He threatened to kill her brother and sister if she did not follow his orders. The ring of the telephone again interrupted Sophia's ordeal. Mills warned her to stay put, threatening that he would kill her if she did not do so. He then answered the phone. When he returned, he once again sodomized Sophia and tried again to rape her.

The telephone rang for a third time and on this occasion, the caller was Sophia's mother. Mills told Ms. Hughes that Janelle and Junior were next door. Mills then informed Sophia that her mother wanted to speak to her, but again warned her that if she disclosed what was going on, he would kill her. Sophia went into her mother's unlit bedroom to use the telephone. Mills remained next to her, his hand around her throat.

As she was speaking to her mother, Sophia noticed blood on the rug, the washing machine, and the closet door. She then saw two bodies under the sink and recognized them as those of her brother and sister. Afraid to alert Mills to the fact that she had discovered what had happened, Sophia did not scream. Rather, she attempted to alert her mother to the fact that something was wrong by not answering questions in a normal fashion. Apparently realizing that something unusual was transpiring, Ms. Hughes told Sophia she would call back in a little while.

Mills then took Sophia back into her bedroom, where he again sodomized and attempted to rape her. Thirty minutes later, Ms. Hughes telephoned again, and a terrified Sophia reassured her that everything was fine. Mills ordered Sophia to pour him a drink and to sit on his lap. He told her that everyone had turned her mother against him and that her mother had told him to leave the house. He lamented that he no longer had anything to live for, that all of them were going to suffer with him, and that he would have to kill Sophia because she would otherwise report what he had done. He also told Sophia not to worry, because she "was not the only one." He said he was going to kill Sophia, her mother, and himself with a gun he had purchased. Mills announced that Odella was out with another man and was "fucking" outside the house, so he was going to "fuck" inside the house.

Mills then ordered Sophia to get back on the floor, but gave her his bathrobe to wear. He told her to lie down and threatened to kill her if she screamed. The telephone rang once again and Mills allowed Sophia to answer it. The caller turned out to be a friend of Sophia's. Mills told Sophia that he was going to the bathroom and that she had better be off the phone when he returned. As soon as Mills had left the room, Sophia, who was still dressed only in her red stockings and Mills' bathrobe, unlocked the apartment door and fled down the street to a Domino's Pizza establishment. She told the manager, Elizabeth Merit, that Mills had killed her brother and sister and was after her and was going to

kill her too. Observing that Sophia was disheveled, bloody and hysterical, Ms. Merit tried to calm her and called the police.

Sophia testified that throughout the ordeal, she had seen a steak knife in the bathroom and two steak knives and a construction hammer[2] on the kitchen counter. She told the jury that the hammer was one which Mills had brought home from work a long time ago, and that it was normally kept on top of the refrigerator or in the kitchen cabinet. She testified that it was unusual for Mills to leave his tools lying around the house.

The police soon arrived at the pizza establishment and found Sophia bleeding and hysterical. After speaking with her, the police officers went to Sophia's home. They knocked on the door, but there was no response. The officers could hear the stereo and television from within. After knocking several more times, they forced their way into the apartment. In the bathroom which adjoined the bedroom, the officers saw feet sticking out of a wool blanket. Upon lifting the blanket, the officers found the bodies of Janelle and Junior. Both children had severe lacerations to the head[3] and were lying in a big pool of blood. Janelle's head had been sliced open, exposing part of her brain. According to one officer's testimony, it looked "as if [blood] had been sprayed" somehow around the room. Janelle and Junior were immediately taken to the hospital where Junior was pronounced dead. Janelle was still alive, but died the following day.

Robert Lane, who lived in the adjoining apartment building, testified that on May 20, 1988, at approximately 10:00 p.m., he ran into Mills about a block from his home. Mills asked him if he wanted to have a drink to celebrate Mills' birthday. Mills told Lane that he had "killed two or three motherfuckers," that "his prints were still on their necks," and that he "was going to kill two or three more." Mills later claimed

that he had been "kidding," and that he "was talking about Spanish people."

Mills was arrested later that night and was taken to the office of the MPD's Homicide Branch. He told the officer guarding him that

[i]t's all my wife's fault. I been home with the kids and she's been dating other men. [Pause]. They, the kids, didn't deserve what happened to them. [Pause]. How much time would I have to do? I cannot afford a good lawyer. Officer, I want you to know I love my son.... You think I'm crazy, don't you? Well I'm not. I can read and write well. I'm a bright young man with a fucked up wife.

Odella Hughes also testified for the prosecution. She stated that she had been living with Mills for three years. She had told Mills of her love for her children, remarking that she did not know if she could live if anything ever happened to them. By May 20, 1988, Ms. Hughes and Mills were having domestic problems. As a result of these problems, Ms. Hughes told Mills that she wanted him out of the house by his birthday. She related that on the morning of May 20, 1988, before Mills left for work, he asked her whether she would be coming home for his birthday. She replied "no," knowing that Mills knew that the relationship had come to an end and that he was to move out by the end of the day. He responded that "it's going to be one hell of a day, Baby" and left the apartment. At the time when Mills made this remark, Ms. Hughes did not have the impression that he was threatening her. Rather, she thought that Mills meant that he would have a "hell of a day" without her.

Ms. Hughes described several telephone calls which she made to her home on the night of the murders. She first called at 8:00 p.m. and spoke to Mills. She asked where Janelle and Junior were, and he told

2. The FBI subsequently found that blood stains on the hammer matched that of Junior's blood protein.

3. At trial, the forensic pathologists who had conducted autopsies on the bodies of Janelle and Junior testified that the cause of death was

five or six multiple blunt force injuries to the face and head, resulting in severe bleeding. The injuries were consistent with the children having been repeatedly struck with an instrument such as the claw of a hammer.

her they were getting a snack. Mills asked Ms. Hughes whether she was coming home, and she answered in the negative. He then told her that he had changed his mind about leaving the apartment voluntarily, and that if she wanted him to leave, she would have to force him out. Ms. Hughes again insisted that she wanted Mills to leave.

Ms. Hughes called home again later in the evening. She spoke to Mills, who told her that Janelle and Junior were next door. She also spoke to Sophia, and quickly noticed something unusual about Sophia's manner. Half an hour later, Ms. Hughes called again, but Sophia reassured her that everything was "fine." Ms. Hughes testified that she tried to call again several times, but received a busy signal.

### B. The Defense Case.

The defense presented a physician who testified that, after examining Sophia on the night of the attack, she found no evidence of vaginal penetration. She also testified that her examination revealed that Sophia was still a virgin. An FBI agent testified that after examining pubic hair samples taken from Mills and Sophia, he found no evidence of Sophia's pubic hair in Mills' sample, or vice versa.[4]

Mills took the witness stand in his own defense. He denied killing Janelle and Junior or raping, sodomizing, threatening or robbing Sophia. He admitted that he was not happy with Ms. Hughes' decision that he should move out of their home. He testified, however, that on May 20, 1988, he worked until 2:30 p.m. and arrived at home at approximately 5:00 p.m. He stated that he left the house at 6:00 p.m., visited his friend, "Mac" Williams[5], until 9:00 p.m., and then went "bar-hopping" for the rest of the night. Mills was impeached with convictions of robbery, attempted robbery, bail jumping and solicitation for prostitution.

---

4. Defense counsel relied on the testimony of the doctor and of the FBI agent as providing reasons to disbelieve Sophia's testimony. The verdict indicates, however, that the jurors found Sophia credible.

## II

## PREMEDITATION AND DELIBERATION

### A. The Motive.

Mills contends that the trial judge committed reversible error by denying his motion for judgment of acquittal on the charge of first degree murder while armed. He claims that the evidence was insufficient as a matter of law to establish premeditation and deliberation. We disagree. A reasonable jury could find on the basis of the evidence presented that the motive for these savage crimes was the vengeance of a spurned lover. The jury could likewise reasonably infer that when Mills was ordered out of the house on his birthday by the woman who had jilted and betrayed him, his desire for revenge, which may well have been lurking beneath the surface during Mills' prior quarrels with Ms. Hughes and his suspicions of her infidelity, led him to make a deliberate and calculated decision to commit the unspeakable crimes of which he stands convicted.

In evaluating a claim of evidentiary insufficiency, this court must view all of the evidence in the light most favorable to the government, with due regard for the jury's right to weigh the evidence, to determine the credibility of witnesses, and to draw reasonable inferences. *Irick v. United States,* 565 A.2d 26, 30 (D.C.1989). When the defendant presents evidence on his own behalf, this court considers the entire record, and not merely the evidence presented by the prosecution, in determining the sufficiency of the proof. *In re A.B.H.,* 343 A.2d 573, 575 (D.C.1975). No distinction is made between direct and circumstantial evidence; *Jones v. United States,* 477 A.2d 231, 246 (D.C.1984); indeed, circumstantial evidence may be more compelling than direct testimony. *Janifer v. Jandebeur,* 551 A.2d 1351, 1352

---

5. Mason Williams testified that he saw Mills at Mac Williams' house during the late afternoon or evening of May 20, 1988, but could not be sure exactly what time he had seen him.

(D.C.1989). "It is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." *Frendak v. United States*, 408 A.2d 364, 371 (D.C.1979); *see also Jones, supra*, 477 A.2d at 246.

The key elements of the offense which are here in dispute are set forth in the statute. "Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison ... is guilty of murder in the first degree." D.C.Code § 22–2401 (1989). Premeditation and deliberation distinguish first degree murder from its second degree counterpart. *Hall v. United States*, 454 A.2d 314, 317 (D.C.1982). "First degree murder, with its requirement of premeditation and deliberation, covers calculated and planned killings, while homicides that are unplanned or impulsive, even though they are intentional and with malice aforethought, are murder in the second degree." *Id.* (citations and internal quotation marks omitted).

As this court explained in *McAdoo v. United States*, 515 A.2d 412, 427 (D.C.1986):

> [t]o prove premeditation, the government must show that a defendant, before acting, gave thought to the idea of taking a human life and reached a definite decision to kill, while deliberation is proved by demonstrating that the accused acted with consideration and reflection upon the preconceived design to kill.... Premeditation and deliberation may be inferred from surrounding facts and circumstances.

(Citations omitted). "[N]o specific amount of time is necessary to demonstrate premeditation and deliberation, [but] the evidence must demonstrate that the accused did not kill impulsively, in the heat of passion, or in an orgy of frenzied activity." *Jones, supra*, 477 A.2d at 247; *see also*

*Hall, supra*, 454 A.2d at 317; *Frendak, supra*, 408 A.2d at 371.

In the present case, the evidence of Mills' desire for revenge provides persuasive proof of premeditation and deliberation. "The presence of a motive suggests a purposeful or reasoned killing." *Hall, supra*, 454 A.2d at 317; *see also McAdoo, supra*, 515 A.2d at 427; *Jones, supra*, 477 A.2d at 247. Proof of a motive to kill is not everything; where such a motive arises immediately before the killing, its existence is not incompatible with a sudden overpowering rage. In Mills' case, however, the obvious motive preceded the murders at least by many hours, and perhaps for much longer than that. The existence of the motive well before the commission of the crime substantially reinforces the inference of premeditation and deliberation. Moreover, there is revealing evidence in this record that Mills had a "hell of a day" on his mind well before he turned the anniversary of his birth into a macabre celebration of death.

Ms. Hughes testified that she had told Mills previously, and again on the day of the murders, that their romance had come to an end and that she wanted him to leave her house and, by implication, her life. Mills admitted on cross-examination that he was hurt by Ms. Hughes' decision, and he acknowledged this in even more dramatic and profane terms while sexually assaulting and tormenting Sophia. He complained to the police about Ms. Hughes' alleged infidelities, indicating that he was at home with the children while she was out dating other men. He proclaimed to Sophia, the murdered children's sister, that since her mother was "fucking" outside the house, he was going to "fuck" inside it and that life was no longer worth living and the entire family would suffer, including Mills himself. These statements are revealing with respect to Mills' state of mind, not only at the time he made them, but also at the time he killed the children. *See United States v. Childs*, 194 U.S.App.D.C. 250, 255–56, 598 F.2d 169, 174–75 (1979).[6] A

---

6. "Proof of subsequent acts may become allowable when they reflect a prior state of mind, particularly where they are fairly recent and in some significant way connected with prior ma-

reasonable jury could find on the basis of this evidence that Mills was upset, that he felt that everything was over for him, and that he was going to punish in the most dreadful way the person whom he held responsible.

Where the object of one's wrath is a mother, it is not difficult to discern that the most devastating punishment one can inflict upon her is to harm her children. This obvious truth hardly needs to be made explicit, but in this case it was. Ms. Hughes testified that she had told Mills how much the children meant to her and how she could not live without them. On the morning of May 22, 1988, Mills had remarked to Ms. Hughes that it would be a "hell of a day." Prior to the events that so tragically bore out his prediction, this could have meant any number of things; Ms. Hughes initially thought, as we have noted, that it was an expression of self-pity precipitated by the prospect of a lonely birthday and perhaps a lonely life. She did not know then, however, what she knows now.

Reasonable people are not required to attribute everything to coincidence, and might well find a connection between the "hell of a day" that was colloquially predicted[7] and the events that actually came to pass. If Mills foretold such a day and then caused it to happen, premeditation and deliberation were surely established beyond a reasonable doubt. Given the sequence of events, the jury was not compelled as a matter of law to believe that Mills' remark in the morning had nothing whatever to do with the events of the evening.

### B. Other Evidence.

■ Although the revenge motif and Mills' remarks about it provide the principal circumstantial evidence of premeditation and deliberation, there is substantially more in the record than that. The hammer, which was conceded to be the murder weapon, was ordinarily kept in the kitchen. The children were murdered with it in the bedroom and the weapon was then returned to the kitchen. Under these circumstances, a jury might reasonably infer that Mills carried it from one room to the other in order to use it as an instrumentality of death, and then attempted to cover his tracks. Carrying the murder weapon to the scene of the crime "is highly probative of premeditation and deliberation ... as it permits the inference that appellant arrived on the scene already possessed of a calmly planned and calculated intent to kill." *McAdoo, supra*, 515 A.2d at 427 (citations and internal quotation marks omitted).

Although transportation of a hammer within a single dwelling unit is obviously less compelling proof of deliberation than bringing a pistol to the murder scene from another house or another street or another city, premeditation is not necessarily a protracted process. The jury could therefore fairly have concluded that in the interval during which Mills retrieved the hammer from the kitchen, he had sufficient opportunity to reflect upon and consider what he was about to do, and thus arrived in the bedroom "already possessed of a calmly planned and calculated intent to kill." *Belton v. United States*, 127 U.S.App.D.C. 201, 203, 382 F.2d 150, 152 (1967).

■ Mills' initially cool demeanor when Sophia returned home from work also supports the inference that his earlier conduct had been premeditated and deliberate. Although the murderous attacks on her siblings had already been completed when Sophia arrived, Mills was in no frenzy as he prepared to assault her. He leaned out of the window and teased her. The stereo and television were playing at a high vol-

---

terial events." *Id.* at 255, 598 F.2d at 174 (footnote with citations omitted).

7. The government suggests that the "hell of a day" remark could reasonably be viewed as a "veiled threat." A threat by the defendant to the deceased prior to the killing may, of course, constitute evidence of premeditation and deliberation. *Byrd v. United States*, 364 A.2d 1215,

1219–20 (D.C.1976). Mills counters that the characterization of these words as a threat is too speculative. In our opinion, even if the remark was not made in a threatening way, a reasonable person who knows what Mills said and what he later did might well conclude that there was a relationship between word and deed.

ume; the effect of which would be to drown out any screams. Mills provided an explanation—albeit a fabricated one—of the children's absence, so that Sophia would not become prematurely alarmed. Mills' ability to act calmly and deliberately so soon after the assault on the children supports the inference that the murders were planned. *See Hairston v. United States,* 497 A.2d 1097, 1104 (D.C.1985) (calm demeanor after commission of crime supports inference of calculated design to kill).

■ Deliberation and premeditation may also be inferred from Mills' commission not of one but of two murders, and from his subsequent armed sexual assault, robbery and threats against a third child. As the government correctly points out, this is not a case in which one person was quickly murdered and the entire episode ended. Rather, Mills had to turn his attention successively to two separate murder victims, and later to a potential third. The evidence established that the murderer killed the children by manually—and repeatedly—swinging a hammer at their heads. There was medical testimony to the effect that the weapon was used at least half a dozen times to strike each of the two youngsters, a dozen or more swings in all. That there was more than one victim is not conclusive [8]—a defendant might conceivably brutalize two children in quick succession in a single unplanned murderous frenzy. Viewing the sequence in the light most favorable to the government, however, the jury surely was not *required* to believe, especially in the light of the other evidence, that there were two successive frenzied slayings and no planned murder. *See Belton, supra,* 127 U.S.App.D.C. at 203, 382 F.2d at 152.

■ Finally, the jurors might properly consider Mills' repeated prevarication about what he had done. He initially provided a false account to Sophia of the whereabouts of her sister and brother. He told the

same lie to Ms. Hughes. After revealing to Robert Lane that he had "killed two or three motherfuckers," he tried to recoup by explaining (falsely) that he had been "kidding" and, perhaps inconsistently, that he had been talking about "Spanish people." Finally, the jury could reasonably conclude that he lied on the witness stand when he denied that he had killed Janelle, lied again when he denied that he had killed Junior, and lied again when he denied assaulting, robbing and threatening Sophia.

False exculpatory statements after the commission of a crime may give rise to an inference of consciousness of guilt, from which guilt itself may be inferred. *Irick, supra,* 565 A.2d at 30 n. 8; *Fox v. United States,* 421 A.2d 9, 13 (D.C.1980). In some cases, the ultimate inference that is drawn from a person's self-serving lies is that he or she "did it," and not necessarily that the deed was done in a particular way with a particular motive. *See, e.g., Irick, supra,* 565 A.2d at 30 (defendant's false statements to police relevant to show consciousness of guilt and guilt of selling drugs). The inference from this kind of conduct, however, is not so limited. Professor Wigmore has written, and this court has recognized,[9] that

[i]t has always been understood—the inference, indeed, is one of the simplest in human experience—that a party's *falsehood* or *other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. *The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole*

8. *See, e.g., Hemphill v. United States,* 131 U.S.App.D.C. 46, 47–48, 402 F.2d 187, 188–89 (1968) (defendant brutally assaulted female acquaintance before murdering her sleeping 10-year–old grandson; evidence of premeditation and deliberation held insufficient).

9. *See Fox, supra,* 421 A.2d at 13 (quoting WIGMORE).

*mass of alleged facts constituting his cause.*

II J. WIGMORE, EVIDENCE § 278, at 133 (Chadbourn ed. 1979) (emphasis added to last sentence only).[10]

### C. Austin and Hemphill.

Mills relies heavily on *Austin v. United States*, 127 U.S.App.D.C. 180, 382 F.2d 129 (1967), *overruled in part on other grounds sub nom., United States v. Foster*, 251 U.S.App.D.C. 267, 783 F.2d 1082 (1986) (en banc) and *Hemphill v. United States*, 131 U.S.App.D.C. 46, 402 F.2d 187 (1968). In each of these 2:1 decisions, the court held the evidence of premeditation and deliberation insufficient to support a conviction for first degree murder. Both Austin and Hemphill had killed their victims with great savagery (Austin had stabbed a woman twenty-six times; Hemphill, like Mills, had struck a child repeated blows to the head with a hammer), and the court held that the government had failed to prove that "this was not murder committed in an orgy of frenzied activity," *Austin, supra*, 127 U.S.App.D.C. at 190, 382 F.2d at 139, or that "there was an interruption to the impulse or frenzy sufficient to justify the inference of reflection and premeditation." *Hemphill, supra*, 131 U.S.App.D.C. at 50, 402 F.2d at 191. Judge Leventhal, the writer of both opinions, made it clear in *Hemphill*, that the result in each case turned on the absence of any showing of motive:

> In considering whether premeditation is permissibly inferred from this evidence we revert to the opinions in *Austin v. United States*, and *Belton v. United States* [127 U.S.App.D.C. 201, 382 F.2d 150 (1967)]. In *Austin* the evidence showed a killing caused by twenty-six major stab wounds from a pocket knife.

There was no testimony indicating motive.[11] The court held the evidence was as consistent with an impulsive and senseless frenzy as with premeditation, and did not permit a reasonable juror to find beyond reasonable doubt that there was premeditation. In *Belton*, the court upheld a first degree murder conviction where the evidence showed that [the] defendant quarreled with his common law wife, brought a loaded gun with him to her apartment, and shot her soon after he entered.

131 U.S.App.D.C. at 48, 402 F.2d at 189 (footnotes omitted). The court pointed out that in *Hemphill*, too, "[t]he attack was without warning or apparent reason." *Id.* at 50, 402 F.2d at 191 (emphasis added).

The savagery in the instant case was undoubtedly comparable to that in *Austin* and *Hemphill*. If the record contained no more, then the arguments that prevailed in those cases could carry the day here. Given the dominance of the vengeance motif in the present record and the lack of anything comparable in *Austin* and *Hemphill*, however, those cases do not support Mills' contentions here. Indeed, we view the evidence of premeditation, taken as a whole, as stronger than that which was held to be sufficient in *Belton*. Accordingly, we hold that a reasonable jury could find Mills guilty of murder in the first degree.

### III

### PROSECUTORIAL MISCONDUCT

 Mills also contends that he was denied a fair trial as a result of alleged prosecutorial misconduct during closing argument. We find several of these allegations altogether lacking in merit and deal with them summarily.[12] Two, however,

---

**10.** *But cf. Austin v. United States*, 127 U.S.App. D.C. 180, 190–91, 382 F.2d 129, 139–40 (1967), *overruled in part on other grounds sub nom., United States v. Foster*, 251 U.S.App.D.C. 267, 783 F.2d 1082 (1986) (en banc) (defendant's flight after committing the crime and his attempt to conceal the victim's body and his own culpability viewed as insufficient to show premeditation and deliberation).

**11.** "There was no testimony as to any fights, quarrels, animosity, or threats between appellant and deceased." *Austin, supra*, 127 U.S.App. D.C. at 183, 382 F.2d at 132.

**12.** The prosecutor did not engage in misconduct when he pointed out, on the basis of ample evidence, that Mills had lied to Ms. Hughes and to Sophia about the whereabouts of the murdered children. *See Irick, supra*, 565 A.2d at 35–36, and authorities cited. Obviously, if the pros-

raise issues which require more searching analysis.

## A. Arguing Facts Not In Evidence.

 Mills contends that the prosecutor significantly misstated the evidence when he remarked during his initial closing argument that Mills murdered Janelle in the bedroom first and thereafter brought Junior into the same room and executed him there. The evidentiary basis for this comment was, to put it mildly, less than compelling, and we agree with Mills that the prosecutor ought not to have made it.

The defendant made a timely objection, and the judge directed the prosecutor to rephrase his argument from his initial bald assertion to a suggestion that the evidence would support such a conclusion. The prosecutor then reframed his argument, and told the jury that

> when you combine this evidence, his motive, his thinking, all the facts and blood in the apartment, it tells you that he took that little boy back in the same place.

There was no evidence as to whether the children were brought into the bedroom separately or together, or as to the order in which they were assaulted. There were specks of Junior's blood, but not of Janelle's blood, on the murder weapon. One might therefore reasonably infer that Janelle was probably Mills' first victim. That is about as far as the evidence goes, however, and we are of the opinion that the government's other proffered justifications for the prosecutor's comment—e.g., that children usually do not go into their parents' bedroom without permission—are speculative and unpersuasive. We therefore conclude that the prosecutor's remark was improper.

 Mills having objected, we must determine whether we can say, "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). In making such a determination, we consider the gravity of the transgression, its relationship to the issue of guilt, the effect of any corrective action, and the strength of the prosecution's case. *Dixon v. United States*, 565 A.2d 72, 75 (D.C.1989).

The trial judge, who was "on the spot" and had a vantage point superior to ours, *see Irick, supra,* 565 A.2d at 32; *Dixon, supra,* 565 A.2d at 75, thought that the inference which the prosecutor sought to draw was a legitimate one. Although the issue is a close one, we do not altogether agree. We wish to make it plain, in any event, that prosecutorial speculation is impermissible even if it is defended as "reasonable inference." We think that the argument was improper, but that it reflected flawed judgment in the heat of battle [13] rather than deliberate distortion of the facts.

If the evidence had supported the prosecutor's assertion, then this would arguably have bolstered the government's showing of premeditation and deliberation. The improper argument was therefore relevant to the question whether Mills was guilty of first or second degree murder. As we have noted in Part II of this opinion, how-

---

ecution witnesses are to be believed, Mills did lie to them. In any event, the prosecutor did not allege that Mills lied on the witness stand, which is the kind of remark which generally triggers the issue raised in *Irick* and in the cases there cited.

The prosecutor's statement that there was no evidence of a mystery killer, and that the source of the notion that there was such a killer was the defense attorney, cannot fairly be construed as an accusation that counsel "manufactured" the defense theory of the case. *Donnelly v. DeChristoforo,* 416 U.S. 637, 643–44, 94 S.Ct. 1868, 1871–72, 40 L.Ed.2d 431 (1974); *Irick,*

*supra,* 565 A.2d at 33–34. Additionally, the prosecutor's impeachment of Mills with a conviction of soliciting for prostitution did not unduly call the jury's attention to the entirely dissimilar charge of rape while armed. Given a lunch recess and a buffer question between Mills' denial of the rape and the impeachment, there was no violation of *Dorman v. United States,* 491 A.2d 455 (D.C.1984) (en banc), and *a fortiori* no plain error.

**13.** *See Dixon, supra,* 565 A.2d at 78–79 (citing *Donnelly, supra,* 416 U.S. at 646–47, 94 S.Ct. at 1873).

ever, there was ample other evidence of premeditation and deliberation.

As soon as the defense attorney objected, counsel approached the bench. After a discussion outside the hearing of the jury, the judge directed the prosecutor, in the hearing of the jury, to rephrase his argument. When the prosecutor did so, it became apparent that the jurors were being asked to draw the proposed inference from the surrounding circumstances. Clearly, the prosecutor was not claiming that anyone had testified that Mills brought the two children into the bedroom separately. Both in his opening instructions and in his final charge, the judge told the jurors that if any reference by the attorneys to matters of evidence did not coincide with the jurors' recollection then *"it will be your recollection of the evidence which will control during your deliberations."* Moreover, "[i]t may be appropriate to observe that the prosecutor's [argument] ... did not preclude defense counsel from arguing the contrary." *Dixon, supra,* 565 A.2d at 80 n. 15.

The parties disagree sharply with one another regarding the strength of the government's case. For the reasons we have stated in Part II of the opinion, we think that the evidence of premeditation and deliberation was substantial, and that an impartial jury could reasonably find it so. In any event, we think that in light of the evidence of preexisting motive and the other circumstances, any possibility that the prosecutor's speculative remark substantially swayed the jury, or influenced its verdict, is remote. The improper inference which the prosecutor tried to draw was but a relatively small part of the government's evidence.

In *Boyde v. California,* 494 U.S. 370, 384, 110 S.Ct. 1190, 1200, 108 L.Ed.2d 316 (1990), the Supreme Court recently had occasion to reemphasize that

> arguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, [citation to transcript omitted], and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law.

Jurors are generally quite capable of detecting prosecutorial non sequiturs. *United States v. Cotter,* 60 F.2d 689, 692 (2d Cir.) (Learned Hand, J.), *cert. denied,* 287 U.S. 666, 53 S.Ct. 291, 77 L.Ed. 575 (1932). As Professor McCormick has written with respect to a different (but comparable) issue—a fallacious "missing evidence" argument—"the remedy is the usual one, namely the answering argument and the jury's good sense." E. CLEARY, McCORMICK ON EVIDENCE § 272, at 807–08 (3d ed. 1984). Examining the record as a whole, we conclude that the prosecutor's improper argument, either standing alone or viewed in the aggregate with his other improper comments, *see Irick, supra,* 565 A.2d at 40, does not warrant reversal of Mills' conviction.[14]

### B. *Appeals to the Passion of the Jury.*

■ Mills also complains of a number of allegedly inflammatory remarks made by the prosecutor during his closing argument. Many of the challenged comments appear to us to have been descriptions of the evidence in an especially horrifying and gory case, and to have fallen within the limits of permissible argument. As we stated in *Dixon, supra,* 565 A.2d at 76,

> [a] fatal stabbing is not an antiseptic event which could or should be made to look pretty. Some types of cases, particularly those involving tragic death or

---

**14.** Reversal of the conviction and a new trial on all charges is not the only available alternative. *See Bowler v. United States,* 480 A.2d 678, 687 (D.C.1984):

> We therefore conclude that the cumulative instances of prosecutorial misconduct deprived appellant of a fair trial on the charge of murder in the second degree. Accordingly,

we reverse and remand for retrial on the charge of murder in the second degree or for entry of a judgment of conviction for manslaughter with directions for resentencing.

For the reasons stated above, however, we do not think that the prosecutor's improper argument supports our invalidation of any part of the jury's verdict.

injury, have an inherent emotional impact.

Some of the prosecutor's remarks, however, do appear to have generated considerably more heat than light.

Describing Mills' assault on Sophia, the prosecutor told the jury

Ladies and gentlemen, he put that young girl through a night of living hell. If there's a hell on earth, that young girl, that 17–year–old girl went through it that night.

Can you think of what it felt to her to see the bodies of her younger brother and sister lying in that pool of blood that night? Not just to see the bodies but while she herself was being raped and sodomized and assaulted, while she thought she was going to die by a man who she had trusted and who her brother and sister and who Odella Hughes had trusted.

With respect to Janelle, the prosecutor asked rhetorically

Do we know whether she cried out or whether she struggled with him or how much pain that she felt when this was happening to her? No, we don't and we'll never know.

"The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence. Conversely, it must not be used to inflame the minds and passions of the jurors...." *Dixon, supra,* 565 A.2d at 77 (citation and internal quotation marks omitted). We think that the quoted remarks were improper. Rather than argue the elements of the offense, the prosecutor asked the jurors in an emotional way to think about the victims' suffering. A timely objection should have (and perhaps would have) precipitated a firm rebuke of the prosecutor as well as a corrective instruction to the jury.

 In the present case, however, the defense, represented by an experienced attorney from the Public Defender Service, interposed no objection. Reversal for plain error in cases of alleged prosecutorial misconduct should be confined to "particularly egregious" situations. *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046,

84 L.Ed.2d 1 (1985); *Irick, supra,* 565 A.2d at 32. We must let the verdict stand unless the misconduct "so clearly prejudiced [Mills'] substantial rights as to jeopardize the very fairness and integrity of his trial." *Sherrod v. United States,* 478 A.2d 644, 655 (D.C.1984) (citation omitted). In the absence of a defense objection, the question presented is whether the judge abused his discretion by failing to intervene *sua sponte* in the prosecutor's argument. *Irick, supra,* 565 A.2d at 33; *Dixon, supra,* 565 A.2d at 78.

We do not for a moment condone the prosecutor's emotionalism in making the quoted remarks. In our view, however, this case does not present the extreme situation justifying reversal under the plain error doctrine. If the prosecutor had not said a word about the children's suffering, the torment which they were compelled to undergo would have been plain to the jury. *See Lemon v. United States,* 564 A.2d 1368, 1376 (D.C.1989). This was doubtless apparent to all concerned; the prosecutor was unnecessarily (and improperly) belaboring the obvious. It is difficult to believe that the prosecutor's emotional description of the children's suffering was responsible for any humane juror's sympathy for them. On a record like the present one, it was surely the events, and not their inappropriate rendition, that precipitated any feelings of indignation that the jury may have had.

We recognize that judicial directions to prosecutors not to transgress are apt to be less effective if a conviction is not reversed when an advocate crosses the line. If the defense had objected, and if the judge had taken no action, the result might perhaps be different. Considering the record in its entirety, however, we cannot say that the very fairness and integrity of Mills' trial was jeopardized by remarks to which a seasoned defense attorney elected not to object. Accordingly, the convictions appealed from must be and each is hereby

*Affirmed.*