**Eugene R. BUSEY, Appellant,**

v.

**UNITED STATES of America, Appellee.**

Nos. 94–CF–1240, 98–CO–1087.

District of Columbia Court of Appeals.

Argued Oct. 28, 1999.

Decided March 23, 2000.

Amendment arguments.

Irwin A. Goldberg, appointed by the court, for appellant.

Alex J. Bourelly, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Elizabeth Trosman, and Daniel M. Zachem, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, RUIZ, and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Appellant Eugene Busey appeals from his convictions for first degree felony murder while armed,[1] first degree premeditated murder while armed,[2] armed robbery,[3] possession of a firearm during a crime of violence,[4] and carrying a pistol without a license.[5] Busey raises four issues for our review: whether the evidence supported his convictions for premeditated murder, felony murder, and armed robbery; whether the admission of prior bad acts evidence and the trial judge's failure to instruct the jury regarding that evidence was prejudicial error; whether the trial court erred in admitting evidence of five cartridges found in Busey's apartment; and whether the trial court should have granted a new trial for newly discovered evidence. We affirm.

I.

Busey's convictions arose out of the shooting of Michael Dickens on December 10, 1993. Government witnesses testified that early that morning, Busey had sold drugs to Dickens, who was sharing his purchases with them in an apartment rented by Carletta Inman. The first transaction involving Busey took place in the hallway of a nearby apartment building. Pamela Jones, who lived across the hall from Busey, gave him a twenty dollar bill and asked for "a twenty rock of cocaine." Busey went into his apartment and did not come out. While Jones was waiting for him outside of his apartment door, she asked Karen Brooks, who witnessed their exchange, to go to Carletta Inman's apartment and "watch Mike" (Dickens). Brooks did so, and returned several minutes later because Dickens wanted to know why Jones was taking so long. After some thirty minutes, Busey still had not emerged from his apartment, so Jones went back to Carletta Inman's apartment. At that time, Carletta Inman, her siblings Jennifer Inman and Russell Inman, Michael Dickens, David Robinson, and Karen Brooks were all in the apartment.

At some point, Busey, whom witnesses referred to as "Geno," arrived at Carletta Inman's apartment, and Pamela Jones asked him about the twenty dollars she had paid him earlier. Busey denied ever receiving the money. Dickens heard this conversation and said not to "worry about

1. D.C.Code §§ 22–2401, –3202 (1996).

2. D.C.Code §§ 22–2401, –3202.

3. D.C.Code §§ 22–2901, –3202.

4. D.C.Code § 22–3204(b).

5. D.C.Code § 22–3204(a).

it." Pamela Jones then left Carletta Inman's apartment and went to wake her sister, Brenda Jones, who was sleeping in a nearby apartment. Brenda Jones and Dickens had a close relationship, and Pamela told Brenda that Dickens was being generous, giving his money away and buying people drugs. Brenda and Pamela then went to Carletta Inman's apartment. Busey was no longer there. Pamela Jones smoked some cocaine there, left to visit another friend's house in the vicinity for about five minutes, and then returned to her mother's house and went to sleep.

Meanwhile, upon arriving at Carletta Inman's apartment, Brenda Jones initially went into the bathroom where Dickens was sitting, and then she and Dickens moved to the "first bedroom" (the bedroom closest to the front door of the apartment). There Dickens gave her two twenty dollar bills and asked her to go purchase two rocks of cocaine. Brenda Jones testified that Dickens removed the money from his right sock. She also testified that after Dickens gave her the forty dollars, he put approximately three hundred dollars back in his sock. Brenda went out to the apartment building next door, bought two "twenty bags" of cocaine, and returned to Carletta Inman's apartment where she gave the drugs to Dickens, who was still in the first bedroom. Dickens shared the drugs with the other people in the apartment.

Dickens then sent Brenda Jones out again to purchase drugs, giving her two more twenty dollar bills from out of his sock. Brenda left the apartment, bought two twenty bags of cocaine, and returned. When she arrived back at Carletta Inman's apartment, she found Busey had returned and was talking with Dickens in the first bedroom. The two men were sitting on the bed, and Dickens had a twenty dollar bill in his hands, which he handed to Busey. Busey then left the apartment, and Brenda Jones closed the bedroom door to express her anger at Dickens for showing Busey where Dickens kept his money. After that, Dickens and Brenda Jones smoked some of the cocaine that she had just purchased. While they were still in the bedroom, Jennifer Inman knocked at the door and said that "Geno wants to know is Mike all right." Busey, who had returned to the apartment,[6] then knocked on the door and said he wanted to "holler at Mike." Brenda Jones opened the door, and Busey asked to speak to Dickens alone. Dickens consented, Brenda Jones left the room, and the door closed. Witnesses heard voices coming from the first bedroom, but they heard nothing that suggested that Dickens and Busey were arguing. Jennifer Inman heard Busey ask Dickens how much money he usually spent when he came in the area. Dickens answered six to seven hundred dollars. The next thing witnesses heard was a gunshot coming from the first bedroom.[7]

Less than one minute later, the door to the first bedroom opened, and Busey emerged. Witnesses reported that he said something like "I don't fuck with you all like that, anyway" or "If any of you all mother fuckers say anything, I'll kill you." Busey then left the apartment and saw David Robinson, who had run out of the building upon hearing the gunshot, in his car. Busey stated that "if anybody says anything they are going to get the same thing," and then asked Robinson for a ride.

**6.** Jennifer Inman testified that this was actually the fourth time Busey visited the apartment that morning. The third time, he had returned to the apartment briefly to ask David Robinson for a ride to Benning Road. On that occasion, Busey stayed in the apartment "no longer than five or ten minutes."

Jennifer Inman also testified that during Busey's fourth visit, before he knocked on the first bedroom door, he asked her the name of the man in that bedroom. She told him that the man's name was "Mike" (referring to Dickens).

**7.** At the time that the gunshot was heard, the individuals present in the apartment were Brenda Jones, Russell Inman, Carletta Inman, Jennifer Inman, David Robinson, Michael Dickens, and Busey.

Robinson asked what had happened, and Busey responded, "[I]t's best for you not to know anything anyway." Robinson testified that Busey appeared calm and did not seem excited. Robinson dropped him off at East Capitol Street and Benning Road at approximately 6:00 a.m.

After the shooting, Brenda Jones and Russell Inman went into the first bedroom and saw Dickens lying on the bed with a gunshot wound to the head. Brenda Jones testified that as soon as she walked into the room she saw that Dickens no longer had his money in his sock because his pant leg was pulled up and his right sock was down. After staying a few minutes to ascertain whether Dickens was still alive, Brenda Jones ran out of the apartment and went to her mother's house. She woke up her sister, DeAngela Jones, shaking and crying, and told DeAngela to call an ambulance. DeAngela Jones testified that when she asked her sister, Brenda, what was wrong, Brenda said "that Geno had killed her friend Mike." Pamela Jones testified that she too was awakened by her sister, Brenda, and that Brenda was in a state of "nervous shock ... crying, trembling, holding her head, stretching her head like she was going out of her mind." Pamela Jones stated that Brenda told her "[t]hat Geno had just shot Mike in the head."

After being dropped off by Robinson on Benning Road, Busey paged his girlfriend's brother, Cedric Gordon, and told Gordon to stay away from Elvans Road, the location of Carletta Inman's apartment. Later that evening Busey asked Gordon to retrieve some clothes for him from Gordon's sister's apartment on Elvans Road. Gordon complied and brought the clothes (which were already packed in a bag in his sister's apartment) back to Busey. Gordon also told Busey that he could stay in Gordon's apartment. A couple of days later, Gordon came home to find Busey there.

A medical examiner testified that the cause of Dickens' death was a single gunshot wound to the head. According to a police firearms expert, the slug recovered by the medical examiner was fired from a revolver and was either a .38 caliber special or a .357 caliber magnum bullet.[8] A police evidence technician testified that he recovered five .38 special bullets from Busey's apartment during the execution of a search warrant there later on the morning of the shooting.

DeAngela Jones and Pamela Jones also testified that two days before the shooting, they were in the hallway of their apartment building and saw Busey holding a silver-colored revolver[9] with a barrel length of eight to ten inches. In accordance with a pretrial *in limine* ruling by the trial judge, the government initially did not attempt to bring out the circumstances under which DeAngela and Pamela saw Busey with the gun. However, after defense counsel cross examined DeAngela Jones regarding her veracity on this point, focusing on her inability to remember the details of what she saw, the trial judge ruled that defense counsel had opened the door to further testimony on redirect examination about the details of the incident. DeAngela Jones then testified that two days before the murder of Dickens, Busey had pointed the gun she described at her head in the presence of Pamela Jones and demanded that she admit she and Busey had engaged in certain specific sexual acts. When DeAngela Jones refused to admit this, Busey pulled the trigger, but the gun did not fire. Pamela Jones testified to

8. The difference between the two types of bullets is simply the length of their cartridges. Both types have the same diameter base, and a .38 special and a .357 magnum revolver have the same diameter barrel. Because of the difference in cartridge length, a .38 cali-ber bullet can be fired from a .357 magnum revolver, but not vice versa.

9. DeAngela Jones testified that the gun had "the turnaround thing on it that you put the bullets in."

essentially the same facts regarding this event.

Lynette Hill was the only witness for the defense at trial. Ms. Hill testified that she lived directly below Carletta Inman's apartment on Elvans Road and did not hear a gunshot in the apartment above her on December 10, 1993.

On June 16, 1994, a jury found Busey guilty of armed robbery, first degree felony murder while armed, first degree premeditated murder while armed, possession of a firearm during a crime of violence, and carrying a pistol without a license. Busey was sentenced on August 18, 1994.

On March 25, 1998, Busey filed a motion for new trial on grounds of newly discovered evidence. The basis for this motion was Busey's proffer of a newly discovered witness who had allegedly "observed what appeared to be an attempt to throw a body over an apartment balcony where the murder occurred." Busey's counsel had located the witness, a Mr. Brown, with the help of an investigator. The investigator supplied an affidavit stating that Mr. Brown had told her that he witnessed "the disposal or attempted disposal of a man's body in the early morning hours of December 10th, 1993." Mr. Brown was not willing, however, to provide an affidavit or written statement himself. Busey requested a hearing so that Mr. Brown could be subpoenaed to give more detailed testimony and the court could determine the credibility and impact of his statement. In a written memorandum and order issued on June 22, 1998, the trial judge denied the motion for a new trial without a hearing, on the grounds that the affidavit came from an investigator rather than the new witness, the affidavit was vague, the new evidence did not exculpate Busey or inculpate anyone else, and the new witness' alleged testimony would not be likely to produce an acquittal at trial.

## II.

### Sufficiency of the Evidence

 Busey argues that the evidence was insufficient to support his convictions for first degree murder while armed, armed robbery, and first degree felony murder, and thus that the trial court erred in denying his motion for judgment of acquittal. In reviewing the denial of a motion for judgment of acquittal, "this court employs the same standard as that applied by the trial court in determining whether the evidence was sufficient to convict." *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987). "'Where the evidence presented at trial is such that a reasonable person could find guilt beyond a reasonable doubt, a motion for judgment of acquittal should not be granted.'" *United States v. Covington,* 459 A.2d 1067, 1070 (D.C.1983) (quoting *United States v. Hubbard,* 429 A.2d 1334, 1337–38 (D.C. 1981)). "So as not to displace the role of the jury, the court deciding the motion must review the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *Curry,* 520 A.2d at 263.

### A. First Degree Murder While Armed

 Busey does not dispute that the evidence was sufficient to prove that he murdered Dickens, but he does contest whether it sufficed to prove murder in the first degree. D.C.Code § 22–2401 provides, in pertinent part: "Whoever, being of sound memory and discretion, kills another purposely, either of deliberate and premeditated malice or by means of poison ... is guilty of murder in the first degree." [10] First degree murder is distinguished from second degree murder in that it requires premeditation and deliberation. *See Mills v. United States,* 599 A.2d 775, 781 (D.C.1991). "To prove pre-

---

10. The "while armed" element of the charge derives from D.C.Code § 22–3202.

meditation, the government must show that a defendant, before acting, gave thought to the idea of taking a human life and reached a definite decision to kill, while deliberation is proved by demonstrating that the accused acted with consideration and reflection upon the preconceived design to kill." *McAdoo v. United States*, 515 A.2d 412, 427 (D.C.1986). "Although no specific amount of time is necessary to demonstrate premeditation and deliberation, the evidence must demonstrate that the accused did not kill impulsively, in the heat of passion, or in an orgy of frenzied activity." *Frendak v. United States*, 408 A.2d 364, 371 (D.C.1979). "Premeditation and deliberation may be inferred from surrounding facts and circumstances." *McAdoo*, 515 A.2d at 427. "[I]ndeed, circumstantial evidence may be more compelling than direct testimony." *Mills*, 599 A.2d at 780.

Busey contends that the government failed to prove that the murder of Dickens was premeditated. He argues that the only evidence is that witnesses heard a gun go off behind a closed bedroom door, discovered Dickens in that bedroom with a gunshot wound to his head, and placed Busey in the room with Dickens when they heard the shot. Busey emphasizes that no witnesses saw him with the murder weapon or testified that he brought a weapon to the scene and that the murder weapon itself was never recovered. No witness testified to hearing any argument between Busey and Dickens. Furthermore, Busey argues, there was insufficient evidence of a robbery, and thus the government never established a motive for the homicide.

■ We agree with the government, however, that there was sufficient circumstantial evidence for a reasonable jury to infer premeditation. First, the circumstances surrounding the murder suggest that Busey "reached a definite decision to kill," *McAdoo*, 515 A.2d at 427, and did not "kill impulsively, in the heat of passion, or in an orgy of frenzied activity," *Frendak*, 408 A.2d at 371. As witnesses testified,

before entering the bedroom Busey said he wanted to speak to Dickens alone. Busey then entered the bedroom and closed the door behind him. Witnesses heard no loud argument, nor anything to suggest that the murder was an unplanned act of anger precipitated by an unexpected dispute or provocation; rather, Jennifer Inman testified that she heard Busey ask Dickens how much money he usually brought with him into the area. Shortly after Busey went into the bedroom, the witnesses heard only one shot, and they found Dickens lying in his bed with a single bullet wound in his head. Busey walked out of the bedroom and the apartment, first making a deliberate threat to the individuals in the room. There is no indication that Busey appeared agitated or inflamed; to the contrary, David Robinson, who drove Busey away from the scene, testified that he appeared calm.

■ The fact that Busey murdered Dickens with a gun is additional evidence that the homicide was premeditated and deliberated, because the jury reasonably could infer that Busey must have brought the weapon with him to Carletta Inman's apartment. Carrying a gun to the scene of the murder is "highly probative of premeditation and deliberation" because it suggests that the defendant arrived on the scene with a preconceived plan to kill. *Frendak*, 408 A.2d at 371; *see also Hall v. United States*, 454 A.2d 314, 318 (D.C. 1982) (defendant bringing murder weapon to scene permits inference he " 'arrived on the scene already possessed of a calmly planned and calculated intent to kill' ") (quoting *Belton v. United States*, 127 U.S.App. D.C. 201, 203, 382 F.2d 150, 153 (1967)); *Mills*, 599 A.2d at 782; *McAdoo*, 515 A.2d at 427. It is true, as Busey argues, that no witness actually saw him with the murder weapon in the apartment. But there was no evidence that Busey somehow might have happened to find the gun while he was inside the apartment—no testimony, for example, that there was a gun already in the bedroom where Dickens

was murdered, or that anyone else who was present at the scene of the murder had a gun; and there was no testimony, nor any physical signs, suggesting a struggle in the bedroom between Busey and Dickens over the weapon. Significantly, however, there was evidence—the recovery of the .38 special cartridges from Busey's apartment and the testimony of DeAngela Jones and Pamela Jones—tending to prove, as we discuss *infra*, that Busey himself contemporaneously possessed and displayed a gun that could have been the murder weapon.

Moreover, as we discuss next, there was sufficient evidence to permit the jury to conclude that Busey had a motive for planning to murder Dickens, namely robbery. Although proof of a motive to kill is not necessarily inconsistent with a "sudden overpowering rage," *Mills*, 599 A.2d at 781, it does tend to suggest " 'a purposeful or reasoned killing,' " *id.* (quoting *Hall*, 454 A.2d at 317). Here, there is no evidence that Busey executed his plan to rob and kill Dickens other than deliberately. Nor did the evidence intimate any plausible reason for the murder other than robbery. On the contrary, the proof established robbery as the motive for Busey's actions, and that proof corroborates the other evidence of premeditation that we have described. Taking all this evidence into account, we are satisfied that it was, *in toto*, sufficient to permit a reasonable jury to return a verdict of guilty on the charge of murder in the first degree.

## B. Armed Robbery

We likewise conclude that there was sufficient evidence to sustain Busey's conviction for armed robbery. To be sure, there were no witnesses to the robbery, and the evidence did not establish exactly how much money Dickens had on his person before he was murdered. Nor was Busey subsequently caught in possession of Dickens' property. Nonetheless, there was substantial evidence which the jury

was entitled to credit supporting the armed robbery charge.

Brenda Jones testified that she saw Dickens remove and replace approximately three hundred dollars or more from his right sock a couple of times during the morning he was shot. She testified that she saw Dickens give a twenty dollar bill to Busey during one of Busey's visits, and that she was angry with Dickens "[b]ecause he showed Geno where his money was at." Jennifer Inman testified that she heard Brenda Jones telling Dickens that he should not show anyone where he kept his money. Inman also overheard Busey in his last visit ask Dickens about the amount of money that Dickens brought with him and heard Dickens say that he typically brought several hundred dollars. Busey murdered Dickens moments after that exchange. Finally, Brenda Jones testified that when she discovered Dickens dead in the bedroom, she noticed immediately that "[h]is pant was pulled up and his sock was down" and his money was gone. In short, there was evidence that Busey learned during his visits to Carletta Inman's apartment that Dickens possessed a large sum of cash in his right sock. Busey left and then returned to the apartment, had ample time to plan to rob Dickens (and to arm himself if necessary), and was alone with Dickens when he was shot. Immediately after the shooting, the witnesses who discovered Dickens' body saw that where he kept his cash had been exposed and the money was gone. There was no evidence to suggest that anyone else had taken the money, and given the witnesses' recitation of the events, Dickens had not spent it all before he was killed.

The jury evidently credited the government witnesses' testimony in convicting Busey on the robbery count. As we noted initially, we defer to the jury's conclusions in evaluating credibility, weighing the evidence, and drawing inferences of fact. *See Curry*, 520 A.2d at 263. Moreover, circumstantial evidence is no less compelling than direct testimony. *See*

*id.; Mills,* 599 A.2d at 780. We see no reason to disregard the jury's factual determination here.

## C. Felony Murder While Armed

■ A conviction for first degree felony murder (robbery) requires the government to prove that the defendant "without purpose to do so kills another in perpetrating or in attempting to perpetrate any ... robbery ...." D.C.Code § 22–2401; *see Page v. United States,* 715 A.2d 890, 892 (D.C.1998). For the reasons stated above, we find that the evidence was sufficient to support Busey's conviction for felony murder based on his killing of Dickens in the course of robbing him.[11]

### *Other Crimes Evidence*

Busey contends that the trial judge erred in admitting the testimony that he assaulted DeAngela Jones with a gun two days before Dickens was murdered. He argues that this was highly prejudicial "other crimes evidence" which in effect was offered, impermissibly to show that he had a propensity to commit the crime for which he was on trial. Busey further argues that the trial judge similarly erred in admitting the evidence of the five .38 caliber cartridges found in his apartment on the day of the murder. The government counters that the evidence that Busey possessed the gun and the cartridges was relevant to prove that he had the means to commit the murder. The government further responds that the evidence of Busey's assault on DeAngela Jones properly was admitted under the doctrine of curative admissibility. We conclude that the trial judge did not abuse his discretion in allowing the evidence to come in as it did.

The admissibility of the challenged evidence initially was raised pretrial. At that time, the trial judge ruled that the cartridges were admissible, and that Jones would be permitted to testify about seeing Busey with a gun, but that she was not to testify in her direct examination about Busey's assault on her with that gun. However, the judge stated:

Now, Mr. [defense counsel at trial], you understand that whenever I state what I'm going to let in and not let in at this point I'm talking about the government's case in chief, and I'm not alluding to any doors that might be open[ed] by either your cross-examination of government witnesses or evidence you might put on. I mean I can conceive how evidence of the threat might come in depending on what questions you ask. And I'm not about to give advisory opinions on what you can and cannot do. But if you have a concern that a question you might be propounding either on cross to a government witness or evidence you might be putting on in your case would, if you put it on, open some doors you don't want to open then you can come to the bench and we can address the issue at that time.

In accordance with the judge's pretrial ruling, the government elicited from Jones on direct examination that she had seen Busey with a gun two days before Dickens was murdered but did not bring out the circumstances. On cross examination, however, Busey's defense counsel challenged Jones credibility by eliciting that she could not remember the time of day she first saw Busey with the gun, which floor of the building she was on, how long she had been there, or what she had been doing that day. The plain import of this cross examination was to suggest that Jones was either mistaken or lying when she testified that she had seen Busey with a gun two days before the homicide. Busey's counsel did not avail himself of the opportunity extended earlier by the trial judge to seek an advance ruling on wheth-

11. Although Busey has not raised the issue, the felony murder conviction merges with the first degree murder conviction. *See (Patrick ) Lee v. United States,* 699 A.2d 373, 382 (D.C. 1997); *Byrd v. United States,* 510 A.2d 1035, 1036–1037 (D.C.1986) (en banc). Busey may move for relief from the cumulative sentences under Super. Ct.Crim. R. 35(a).

er this cross examination would open the door to testimony on redirect examination about Busey's assault on Jones.

After the cross examination, the government asked for permission to question Jones on redirect about the circumstances under which she had seen Busey with a gun, *i.e.,* the assault. The government contended that defense counsel had opened the door by questioning Jones' ability to remember details surrounding that event. In ruling that the prosecutor would be allowed to elicit the details of the assault from Jones on redirect, the trial judge stated:

> I mean the whole thrust of her cross-examination is to suggest to the jury that this never happened because of her poor recollection. It seems to me that to the extent that there are circumstances surrounding this that help focus her memory on it, those are entirely relevant, Mr. [defense counsel]. I don't see how you can say you didn't open the door. I mean I just don't understand. I mean the reason she remembers this is because she had a gun pointed at her. That's a pretty vivid memory refresher. I mean, that's a pretty vivid basis to remember something.

On redirect Jones described how Busey had held a gun to her head and pulled the trigger when she refused to admit that she had engaged in a certain sexual activity

with him, as summarized above. Defense counsel was given the opportunity to re-cross examine Jones. Pamela Jones subsequently testified and confirmed DeAngela's account.

 To begin with, it is fundamental, as Busey argues, that evidence of a crime for which the accused is not on trial is "inadmissible to prove *disposition* to commit crime, from which the jury may infer that the defendant committed the crime charged. Since the likelihood that juries will make such an improper inference is high, courts presume prejudice and exclude evidence of other crimes unless that evidence can be admitted for some substantial, legitimate purpose." *Drew v. United States,* 118 U.S.App. D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964) (footnotes omitted). So-called *Drew* evidence of crimes that are independent of and unrelated to the charged offense has been held admissible only if offered for specified, limited purposes [12] and if other requirements are also satisfied.[13]

 The rules are somewhat different, however, where the "other crime" is *not* independent of and unrelated to the charged crime:

> *Drew*'s strictures do not come into play in every instance in which evidence offered to prove guilt of the charged of-

---

**12.** "Evidence of other crimes is admissible when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial. When the evidence is relevant and important to one of these five issues, it is generally conceded that the prejudicial effect may be outweighed by the probative value." *Drew,* 118 U.S.App. D.C. at 16, 331 F.2d at 90. This list of exceptions is not exhaustive. Other exceptions may be permitted where the evidence is admitted for " 'some substantial, legitimate purpose.' " *Adams v. United States,* 502 A.2d 1011, 1015 n. 3 (D.C.1986) (quoting *Drew,* 118 U.S.App. D.C. at 16, 331 F.2d at 90).

**13.** In addition to demonstrating that evidence subject to the strictures of *Drew* is relevant to a recognized exception, see *supra* note 12, our cases have held that the defendant's commission of the other crime must be established preliminarily by clear and convincing evidence (unless it has already been established by an adjudication in a separate proceeding); that otherwise admissible *Drew* evidence should nonetheless be excluded if the trial judge finds that the danger of unfair prejudice that it poses substantially outweighs its probative value, *see Johnson v. United States,* 683 A.2d 1087, 1092–93 (D.C.1996); and that when admitting *Drew* evidence, the trial judge should give a limiting instruction, *id.* at 1097 n. 10.

fense could be offered in support of a prosecution of another crime. Specifically, *Drew* does not apply where such evidence (1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context.

*Johnson, supra* note 13, 683 A.2d at 1098.

 The one requirement that applies to the admission of all evidence of "other crimes," *Drew* and non-*Drew* alike, is that relevance, or probative value, must be weighed against the danger of unfair prejudice. Relevant evidence is simply "that which tends to make the existence or nonexistence of a [contested] fact more or less probable" than it would be without the evidence. *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977); *see also* Fed. R.Evid. 401. The "test for relevance is not a particularly stringent one." *Street v. United States,* 602 A.2d 141, 143 (D.C. 1992); *accord (Lamont) Jones v. United States,* 739 A.2d 348, 350 (D.C.1999). In weighing the probative value of evidence versus potential prejudice to the defendant, this court has adopted the standard in Federal Rule of Evidence 403 and applies that standard in the other crimes context: "evidence [otherwise relevant] may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice it poses." *Johnson, supra* note 13, 683 A.2d at 1101. This balancing of probative value and prejudice is committed to the discretion of the trial judge, and this court will review it only for abuse of that discretion. *See id.* at 1095; *(James) Jones v. United States,* 477 A.2d 231, 237 (D.C.1984). This is the appropriate framework in which to examine the admission of the other crime evidence in this case.

 The testimony that Busey possessed a revolver that might have been the murder weapon was not admitted improperly to establish criminal propensity. That evidence was directly relevant, and was not *Drew* evidence, because it constituted evidence supporting the charge that Busey was the person who robbed and murdered Dickens. "An accused person's prior possession of the physical means of committing the crime is some evidence of the probability of his guilt, and is therefore admissible." *Coleman v. United States,* 379 A.2d 710, 712 (D.C.1977); see also *Johnson, supra* note 13, 683 A.2d at 1097; *King v. United States,* 618 A.2d 727, 730 (D.C.1993); *Jackson v. United States,* 623 A.2d 571, 587 (D.C.1993); *Ali v. United States,* 581 A.2d 368, 375 (D.C.1990). Similarly, the five .38 caliber cartridges found in Busey's apartment likewise were admissible as non-*Drew* evidence that Busey had a gun of the caliber that fired the bullet that killed Dickens, and that the silver-colored revolver that DeAngela and Pamela Jones saw Busey wield was indeed that weapon. *See Bright v. United States,* 698 A.2d 450, 455–56 (D.C.1997); *Thomas v. United States,* 685 A.2d 745, 749–50 (D.C. 1996); *Jackson,* 623 A.2d at 587; *Marshall v. United States,* 623 A.2d 551, 554 (D.C. 1992). It is true that the evidence established only a reasonable probability, and not a certainty, that Busey possessed the murder weapon two days before the murder. But the connection of the gun with the murder was not "conjectural and remote," *see Burleson v.. United States,* 306 A.2d 659, 662 (D.C.1973), and so the lack of certainty goes to the weight of the evidence, not its admissibility, *see Ali,* 581 A.2d at 375; *(Ronald) Lee v. United States,* 471 A.2d 683, 685–86 (D.C.1984); *Burleson,* 306 A.2d at 661.

In permitting DeAngela Jones to testify that she saw Busey with a gun two days before the murder, the trial judge exercised his discretion to preclude the government from eliciting the context—that Busey held the gun to her head and pulled the trigger—during Jones' direct examination. Given the inflammatory nature of that assault, and its lack of direct relation to the crimes with which Busey was charged, the trial judge reasonably concluded that the risk of unfair prejudice to

Busey would outweigh the probative value of permitting the jury to be apprised of the context. But as the trial judge warned, this exclusionary ruling was provisional, because the balance of probative value versus unfair prejudice could be altered by defense counsel's cross examination of DeAngela Jones. That is exactly what occurred. On cross examination defense counsel undertook to discredit Jones' report of seeing Busey with a gun by highlighting her inability to remember details of the incident. At that point, the probative value of testimony about the assault increased dramatically. The context became highly relevant in evaluating whether to believe Jones; for she could testify that despite her haziness as to some details, she vividly remembered seeing Busey with a gun because he threatened her with it if she did not admit to engaging in a particular sex act with him. *Cf. Minick v. United States*, 506 A.2d 1115, 1119 (D.C.1986) ("witnesses' specific references to a detail like the parole papers added 'narrative veracity' to their testimony and reinforced their credibility to recall the events on the evening in question"); *see also Samuels v. United States*, 605 A.2d 596, 598 (D.C. 1992).

■■■■ The trial judge did not abuse his discretion in reassessing the balance of prejudice and probative value following the defense cross examination. *See (James) Jones*, 477 A.2d at 237. The testimony that Busey assaulted DeAngela Jones was not offered as propensity evidence, nor as *Drew* evidence, but rather in response to cross examination which opened the door to greater context regarding a relevant event, *i.e.*, Busey's possession of what might have been the murder weapon. We have sometimes said that under the doctrine of curative admissibility the prosecution may introduce otherwise inadmissible evidence after the defense has "opened the door," while we simultaneously have warned that this doctrine must not be overused to prejudice the defendant unfairly. *See Mercer v. United States*, 724

A.2d 1176, 1192 (D.C.1999). At bottom, the notions of "opening the door" and "curative admissibility" rest on the more general concept that the balance of prejudice against probative value may change during the course of a trial. We articulated the test in *Johnson*—whether the risk of unfair prejudice substantially outweighs the probative value of the proffered evidence. *See Johnson, supra* note 13.

We do not doubt that the evidence of Busey's assault on DeAngela Jones was prejudicial to Busey. The trial court properly ruled that the government could not elicit this evidence on direct examination. But because the relevance of the assault increased dramatically after the cross examination of Jones, we are satisfied that the trial judge exercised his discretion soundly in concluding that testimony about the assault would be admissible on redirect despite the risk of prejudice.

■■■■ Busey complains that the trial judge did not mitigate the prejudice by means of a limiting instruction. Generally, the trial court should, upon request, consider instructing the jury as to the limited purpose of other crimes evidence. Where the other crimes evidence is not within the *Drew* category, because the other criminal conduct is not independent of the crime charged, the decision to give such an instruction when one is requested is committed to the "sound discretion" of the trial court. *See Johnson, supra* note 13, 683 A.2d at 1097 n. 10. And as we observed in *Johnson*, "[w]here the other criminal conduct is as serious as that involved in this case, the sound exercise of discretion would almost invariably result in granting a request for an instruction." *Id.* However, Busey did not ask for a limiting instruction. Rather, his counsel expressed satisfaction with the trial court's proposed jury instructions, which did not include an instruction on the proper use of the other crimes evidence in this case. "In light of the fact that appellant did not request that a limiting instruction be given, the standard of appellate review is whether plain

error was committed." *Green v. United States,* 440 A.2d 1005, 1008 n. 8 (D.C.1982); *see (James) Jones,* 477 A.2d at 241. We cannot find plain error, or indeed, any error, here.

In contrast to cases involving true *Drew* evidence, where—as here—"evidence of one crime is inextricably entwined with the evidence necessary to prove that the accused committed the crime charged," we have held that the trial court is not required to give a limiting instruction *sua sponte.* *(James) Jones,* 477 A.2d at 243 (trial court not required to instruct *sua sponte* with respect to gun possession evidence offered as proof of an element of charged offense); *see also (Ronald) Lee,* 471 A.2d at 686 (*sua sponte* limiting instruction not required with respect to evidence that defendant possessed knife that might have been used to commit the crime charged); *Smith v. United States,* 312 A.2d 781, 785 (D.C.1973) (testimony went directly to showing guilt and thus no limiting instruction was necessary). The evidence of the assault was admitted as evidence of appellant's prior gun possession—which was proof that the appellant possessed the means to commit the murder. Our review of the prosecutor's examinations of the Joneses and the prosecutor's closing arguments satisfies us that the jury was not asked improperly to infer criminal propensity from the evidence of the prior assault. Moreover, we are mindful that defense counsel's failure to request a limiting instruction may well have been a tactical decision to avoid having the trial judge emphasize to the jury the significance of the unfavorable evidence. *See (James) Jones,* 477 A.2d at 243–44 & n. 30 (defense counsel's decision not to request any cautionary instructions was consistent with his trial strategy).

██ Plain error necessitating reversal must be "clear" or "obvious," *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), and must be so serious that it jeopardized the fairness of the trial or caused a miscarriage of justice. *Johnson v. United States,* 520 U.S. 461, 469–70, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). Neither requirement for a finding of plain error is met here. The trial judge committed no error in not giving a limiting instruction *sua sponte,* and in our view the integrity of Busey's trial and conviction is not undermined by the admission of the "other crimes" evidence in this case without a limiting instruction.

## New Trial Motion

Busey also claims that he was denied improperly a hearing on his motion for a new trial based on newly discovered evidence, *i.e.,* a witness who allegedly would testify that he saw some of the government witnesses attempting to lower a body over a balcony of the apartment building where Dickens was killed. Although this new witness did not himself furnish a statement containing these facts to the trial court, Busey proffered the anticipated substance of the witness's testimony in an affidavit from an investigator. Busey argues that this witness's observations not only cast significant doubt on the credibility of the government witnesses, but also would have enabled Busey to develop a defense theory at trial that Dickens was robbed and murdered by some of those very witnesses and not by him.

██ "We review the motions judge's grant or denial of a new trial motion only for abuse of discretion, and we will uphold the denial of such a motion as long as that denial is reasonable and supported by the evidence in the record." *Townsend v. United States,* 549 A.2d 724, 726 (D.C.1988) (citations omitted). "The prerequisites for the granting of a new trial because of newly discovered evidence are: (1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the

issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal." *Heard v. United States,* 245 A.2d 125, 126 (D.C.1968); *accord Payne v. United States,* 697 A.2d 1229, 1234 (D.C.1997).

■■■■■■ "Generally, a hearing is not required on a motion for a new trial." *Payne,* 697 A.2d at 1234.

> Rule 33 authorizes the court, in considering a motion for new trial, to 'take additional testimony' if the case was tried without a jury. Beyond that, however, the rule says nothing about a hearing, and we have held that a trial court is not required to hold a hearing before ruling on such a motion. We have upheld the denial of a Rule 33 motion without a hearing when the trial court, after examining the proffered affidavit of a witness, concluded that the material contained in the affidavit would not 'in all likelihood' result in an acquittal.

*Prophet v. United States,* 707 A.2d 775, 779 (D.C.1998) (citations omitted). While we ordinarily would prefer the trial court to hold a hearing where, as here, the defense proffers a reluctant witness whose testimony could be developed further in court and under subpoena, we cannot say that in this case the new witness's testimony likely would have produced an acquittal. Even assuming that the witness would have testified credibly that he saw particular government witnesses attempting to dispose of Dickens' body, that would not refute directly the substantial evidence (including the evidence of Busey's own behavior following the murder) that it was Busey who robbed and shot Dickens himself. Although we hesitate to characterize the proffered evidence as merely impeaching, we are compelled to agree with the trial judge that it would not be likely to produce an acquittal. Accordingly, we hold that the trial judge did not abuse his discretion in denying the new trial motion without a hearing.

For the foregoing reasons, we affirm Busey's convictions.

*Affirmed.*